JOHN HAYDEN, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*
(Track Service, Inc., Appellee).

First District (Industrial Commission Division) No. 1—90—1577WC

Opinion filed May 17, 1991.

Michael P. Casey, of Calumet City, for appellant.

Sweeney & Riman, Ltd., of Chicago (John P. Connolly, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, John Hayden, sought worker's compensation for lower back and left arm injuries sustained in the course of employment with respondent, Track Service, Inc. An arbitrator awarded petitioner medical benefits and $513.33 per week for a period of 40³/₇ weeks as temporary total disability. The arbitrator found that petitioner was not temporarily and totally disabled after May 30, 1988, when it became clear that he was unwilling to cooperate with rehabilitation efforts. The Industrial Commission (Commission) upheld that finding and the circuit court of Cook County confirmed the Commission's decision. Petitioner appeals.

Petitioner, age 41, was hired by respondent as a structural ironworker on August 21, 1987. Petitioner sustained an injury to his lower back and left arm on the first day of employment while riding as a passenger in the back of a pick-up truck. The truck unexpectedly struck a large ditch, and petitioner struck his lower back on a wheel cover and was hit in the left arm by a metal tool box. There is no dispute that the accident arose out of and in the course of petitioner's employment with respondent.

On August 24, 1987, petitioner sought medical treatment at a hospital. X rays of the lumbar spine and left elbow proved negative. Petitioner's condition was diagnosed as a contusion of the lower back and left elbow.

On August 25, petitioner was examined by Dr. Garvin, who diagnosed his condition as acute lumbar and cervical myositis and left elbow abrasion. Dr. Garvin treated petitioner with osteopathic manipulation, physical therapy, and anti-inflammatory agents.

Petitioner was next referred to Dr. Heyer, an osteopath associated with the Glenwood Medical Center. On September 28 Dr. Heyer conducted an examination of the petitioner. Petitioner underwent

physical therapy for his lower back and left arm, and participated in a work-hardening program from February 2 through April 1, 1988.

On February 22, 1988, petitioner was examined by Dr. Robert P. Kazan, a neurosurgeon. Upon review of petitioner's medical records, Dr. Kazan opined that petitioner had a low back pain syndrome with right leg pain. Dr. Kazan did not recommend surgery because of the very slight finding on the myelogram. Petitioner did not have a herniated disc.

On March 11, 1988, petitioner was examined by Dr. Michael Morgenstern, an orthopedic surgeon. Dr. Morgenstern's examination indicated the following: normal gait, normal heel and toe gaits, no evidence of any muscle spasms, shifting or tilting and normal motion of the spine. Dr. Morgenstern diagnosed petitioner's condition as a healing and musculoligamentous sprain of the lumbosacral spine and healing soft tissue trauma involving the left upper extremity. Petitioner's subjective complaints included pain in his left elbow, left shoulder, and back of his neck as well as lower back pain with intermittent radiation of pain to his right buttock and to the back part of his thigh, ending in the midportion of his right thigh. Objective examination of petitioner was normal. Dr. Morgenstern concluded that from an orthopedic standpoint, petitioner was able to return to work.

Upon completion of the work-hardening program, Dr. Heyer released petitioner to resume employment on April 14, 1988, in any environment with the exception of unprotected heights. Dr. Heyer placed no restrictions on petitioner's ability to lift, kneel, bend, or squat.

On May 9, 1988, petitioner was examined by Dr. I. Joshua Speigel, who performed a detailed neurological, low back and cervical spine examination on petitioner. Dr. Speigel found that petitioner's gait and station were normal; there was moderate lumbosacral paravertebral muscular spasm; and tenderness to percussion over the spinous processes of L4, L5 and S1. Dr. Speigel concluded that the protruded intervertebral disc at L4 and L5 was nonsurgical. Dr. Speigel advised continued conservative therapy, and opined that for the foreseeable future petitioner's low back will be at risk. Dr. Speigel recommended that petitioner do no acute back-bending, weight-lifting, protracted walking, standing, sitting or straining.

On July 5, 1988, Dr. Heyer confirmed that as a result of the work-hardening program, occupational therapy, physical therapy, medications and osteopathic manipulative therapy, petitioner showed marked improvement. Petitioner's condition had improved to the point where he was capable of performing almost any type of employment except

that of a structural ironworker. (Petitioner had experienced three sudden, severe, paralyzing psoas muscle spasms that caused him to collapse. Dr. Heyer expressed his concern that if petitioner were to return to his normal duties as a structural ironworker, he could conceivably experience an acute psoas muscle spasm while many floors above the ground, causing a fall.)

On April 25, 1989, petitioner was again examined by Dr. Morgenstern. Dr. Morgenstern concluded that petitioner needed no further medical care for his back and left arm. Like Dr. Heyer, Dr. Morgenstern found that petitioner could return to gainful employment with the condition that he could not work at unrestricted heights.

On April 5, 1988, concurrent with petitioner's release to return to work, petitioner was referred by respondent to James Boyd of Rehabilitation Management, Inc., for job development and placement services. Petitioner had worked as a structural ironworker for the past 17 years. His college education consisted of 2½ years in the areas of marketing, management, and accounting. Petitioner served three years in the U.S. Marine Corps, during which time he sustained an injury resulting in the loss of the two middle fingers on his left hand. Prior to beginning employment as a structural ironworker, petitioner worked as a payroll clerk and personnel interviewer for United States Steel.

Boyd met with Dr. Heyer, who informed him that petitioner had been released to return to work with no specific restrictions except to avoid working at unprotected heights, which would preclude him from returning to structural ironwork. Petitioner's previous duties as an ironworker included welding. Boyd agreed to concentrate petitioner's initial job search to welding. However, with petitioner's educational background and work experience at U.S. Steel, he qualified for a variety of managerial positions. Boyd assisted him in preparing a resume which was distributed to various employers.

Petitioner applied for welding positions with several companies, including Chicago Bridge & Iron, Steel Structures, and FSC Alsip. Petitioner was also interviewed by Precision Lens Crafters for an entry-level manager trainee position and was considered a very appropriate candidate.

Boyd arranged an interview for a training position with the machinists union. This union sponsored a skill-training program for severely disabled young adults. The job skills were primarily clerical in nature and involved a very individualized format. Starting salary would have been $10 per hour. Boyd considered petitioner to be an excellent candidate for this job and scheduled an interview for him.

Initially, petitioner appeared very interested in this job possibility because he had always had a strong interest in teaching and coaching. On May 26, 1988, petitioner was interviewed by Jill Radke and Jan Daniels of the machinists union.

Boyd followed up with Radke and Daniels immediately after the interview. Within the first few minutes of the interview, petitioner stated that he would not be interested in the job; that he would be "bored" and would not want to take the job and then quit shortly afterward. Petitioner stated that his primary interest was in working outdoors and finding a welding job. Petitioner also indicated that he planned to return to school and complete his degree if he did not get a welding job. According to Radke, petitioner was pleasant, but made no effort to sell himself. Petitioner was also tentative about his medical status, claiming the possibility of future surgery. Under the circumstances, Radke did not consider petitioner for the position, although she believed that he would have definitely been a contender if he were interested in it.

Boyd confronted petitioner after the interview. Petitioner admitted that he told Radke that he would not take a job in which he was not interested. Petitioner intended to wait for a final hiring decision from Chicago Bridge & Iron, Steel Structures, and FSC. If an offer did not materialize, he was considering returning to school on a fulltime basis to obtain his degree. Boyd asked petitioner whether he would be interested in the management trainee position with Precision Lens Crafters. Petitioner declined, stating that he would not be interested in that type of work. Boyd recommended that further rehabilitation efforts be withheld until petitioner made a commitment to pursue jobs for which he is currently qualified.

On May 31, 1988, respondent terminated petitioner's temporary total disability because of petitioner's failure to cooperate with placement efforts. On January 17, 1989, petitioner filed a petition under section 19(b—1) of the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.19(b—1)) for an emergency hearing to determine petitioner's right to continued benefits.

On June 16, 1989, the emergency hearing was held. An arbitrator found that petitioner was temporarily totally disabled as a result of accidental injuries which arose out of and in the course of employment from the date of his injury and the date when his condition reached a state of permanency, April 14, 1988. After that point, he was entitled to temporary total disability until May 30, 1988, when it became clear that he was unwilling to cooperate with placement efforts. In total, these two time periods consisted of 40³/₇ weeks of tem-

porary total disability at the rate of $513 per week. Petitioner's medical bills were also paid from the date of the accident through May 30, 1988.

The arbitrator determined that petitioner substituted his judgment for that of the physician in advising the machinists union personnel that he would be returning to structural iron work within three to six months. Based upon petitioner's lack of cooperation with the vocational efforts of Boyd and Rehabilitation Management, temporary total disability benefits were terminated. The Commission upheld the arbitrator's decision.

The sole issue on appeal is whether the Commission's decision terminating temporary total disability and medical benefits because of petitioner's unwillingness to cooperate with vocational placement was against the manifest weight of the evidence.

At the outset, we note that whether a claimant is entitled to compensation for temporary total disability generally is a question of fact, and the reviewing court will only disturb the findings of the Commission if contrary to the manifest weight of the evidence. *Phillips Getschow Co. v. Industrial Comm'n* (1988), 172 Ill. App. 3d 769, 527 N.E.2d 114, citing *United States Steel Corp. v. Industrial Comm'n* (1985), 133 Ill. App. 3d 811, 478 N.E.2d 1108.

Review of the record in this case supports the Commission's conclusion that petitioner was no longer entitled to temporary total disability and medical benefits. An employee is totally disabled when he cannot perform any service except those for which no reasonably stable labor market exists. (*Archer Daniels Midland Co. v. Industrial Comm'n* (1990), 138 Ill. 2d 107, 561 N.E.2d 623; *Ceco Corp. v. Industrial Comm'n* (1983), 95 Ill. 2d 278, 447 N.E.2d 842; *Interlake, Inc. v. Industrial Comm'n* (1981), 86 Ill. 2d 168, 427 N.E.2d 103.) Section 8(b) of the Act provides that "weekly compensation *** shall be paid *** as long as the total temporary incapacity lasts." (Ill. Rev. Stat. 1987, ch. 48, par. 138.8(b).) An employee is temporarily totally incapacitated from the time an injury incapacitates him for work until such time as he is as far recovered or restored as the permanent character of the injury will permit. (*Archer Daniels*, 138 Ill. 2d 107, 561 N.E.2d 623; *McKay Plating Co. v. Industrial Comm'n* (1982), 91 Ill. 2d 198, 437 N.E.2d 617; *Brinkmann v. Industrial Comm'n* (1980), 82 Ill. 2d 462, 413 N.E.2d 390.) Thus, once an injured employee's physical condition stabilizes, he is no longer eligible for temporary total disability benefits.

In this case, sufficient evidence exists to support the Commission's finding that petitioner's condition had reached a state of

permanency by the time he was released to return to work by Dr. Heyer on April 14, 1988. Dr. Heyer, petitioner's treating physician, placed no restrictions on petitioner's ability to lift, kneel, bend or squat. After examining petitioner on March 11, 1988, and again on April 25, 1989, Dr. Morgenstern found that petitioner could return to gainful employment with the condition that he could not work at unrestricted heights. Similarly, Dr. Kazan's examination indicated that petitioner did not require surgery and that he did not have a herniated disc. Although Dr. Speigel's opinion conflicts with that of Dr. Heyer with respect to petitioner's limitations and inability to do acute back-bending, weight-lifting, protracted walking, standing, sitting or straining, it is the province of the Commission to resolve disputed questions of fact, resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *Board of Education v. Industrial Comm'n* (1983), 96 Ill. 2d 239, 449 N.E.2d 839.

At the emergency hearing, petitioner testified that his current activities on a day-to-day basis include getting his four sons (ages 15 through 3) ready for school, and that he took care of his youngest son during the day with some assistance from his wife's parents. Petitioner's wife was a school teacher. Petitioner also loaded the washing machine, prepared dinner, cleaned the garage, and performed minor electrical work around the house as part of his day-to-day activities.

Petitioner played basketball on several occasions between August 21, 1987, and March 15, 1988. Petitioner also coached basketball in April and May of 1988, and coached Little League baseball from May through July 1988.

We conclude that the medical testimony of Drs. Kazan, Heyer and Morgenstern, as well as petitioner's own testimony as to the household duties he was able to perform and participation in sports activities, are sufficient to establish that the Commission was correct in concluding that he was no longer entitled to temporary total disability because his condition had reached a state of permanency.

Next, we turn to petitioner's contention that the Commission's finding of a lack of cooperation regarding placement was based solely on his statements to Jill Radke at the machinists union interview. Petitioner told Radke that he was not completely satisfied with office work and found it rather "boring"; that he was unable to type because he lost two fingers while in the military; and that he would leave the position if another construction job became available.

We find ample additional evidence, however, that petitioner was unwilling to cooperate with vocational placement efforts. In addition to expressing no interest in the machinists union training position, he

declined to pursue the manager trainee position with Precision Lens Crafters. Petitioner's only medical restriction, that he not work at unprotected heights, did not preclude him from accepting any of these positions for which he was qualified. We also note that the training position at the machinists union paid a comparable salary to the welding positions that petitioner hoped to secure.

At the emergency hearing, petitioner testified that he had not been doing anything lately to secure a job, and that his last job contact was in February 1989. Petitioner was not currently enrolled in any school program. Petitioner also stated that he did not submit any employment applications or seek employment during August through December of 1988.

■■ We agree with the Commission's determination that petitioner's absence of good faith in cooperating with the vocational rehabilitation efforts justified respondent's termination of his temporary total disability benefits. In attempting rehabilitation of the injured employee, the Commission should establish boundaries which reasonably confine the employer's responsibility including a requirement that the claimant make good-faith efforts to cooperate in the rehabilitation effort. *Archer Daniels Midland Co. v. Industrial Comm'n* (1990), 138 Ill. 2d 107, 561 N.E.2d 623, citing *National Tea Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 424, 454 N.E.2d 672.

For the foregoing reasons, the judgment of the circuit court of Cook County finding that the decision of the Commission is not against the manifest weight of the evidence is affirmed.

Judgment affirmed.

McCULLOUGH, P.J., and WOODWARD, STOUDER, and LEWIS, JJ., concur.