KEVIN L. HESS, Plaintiff-Appellant, v. CLARCOR, INCORPORATED, Defendant-Appellant.—PATSY J. TURNER, Plaintiff-Appellee, v. CLAR-COR, INCORPORATED, Defendant-Appellant.

Second District Nos. 2—91—1100, 2—91—1296, 2—91—1336 cons.

Opinion filed November 19, 1992.

Bruce R. Alper and Christopher A. Johlie, both of Vedder, Price, Kaufman & Kammholz, of Chicago, for Clarcor, Incorporated.

David B. Menchetti, of Cullen, Haskins, Nicholson & Menchetti, of Chicago, and Gregory E. Tuite, of Tuite, Shaw, Gesmer, Finnegan & Tuite, of Rockford, for Kevin L. Hess and Patsy J. Turner.

JUSTICE GEIGER delivered the opinion of the court:

The plaintiffs, Kevin Hess and Patsy J. Turner, sued to enjoin the defendant, Clarcor, Inc. (Clarcor), from terminating their employment. The plaintiffs alleged that the threatened discharges were in retaliation for the plaintiffs' filing of claims under the Workers' Compensation Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.1 *et seq.*). Charles Turner, who is not a party to this appeal, brought a similar action. The trial court consolidated the actions. After an evidentiary hearing, the court denied Hess and Charles Turner injunctive relief, holding that Clarcor did not violate public policy by terminating either, because the firings were the result of Clarcor's nondiscriminatory absenteeism policy and were not undertaken in retaliation for the exercise of rights under the Workers' Compensation Act.

The court preliminarily and permanently enjoined the defendant from terminating Patsy Turner. Relying on *Hartlein v. Illinois Power*

*Co.* (1991), 209 Ill. App. 3d 948, which was reversed by the supreme court in an opinion (No. 72303) filed October 1, 1992 (151 Ill. 2d 142), the court concluded that Clarcor terminated Patsy Turner, not because she was subject to the absenteeism policy, but in retaliation for her having filed a workers' compensation claim.

On appeal, Kevin Hess argues that his case is legally indistinguishable from Patsy Turner's and, thus, that the trial court should have enjoined Clarcor from terminating him. Clarcor responds that (1) the court correctly found that Clarcor did not discharge Hess in retaliation for his exercise of rights under the Workers' Compensation Act; and (2) even had Hess proved retaliatory discharge, he would be entitled only to money damages and not to an injunction against termination.

Clarcor appeals the judgments in favor of Patsy Turner, arguing that (1) the trial court erred in finding that Clarcor discharged Patsy Turner in retaliation for her exercise of her rights under the Workers' Compensation Act; and (2) even if Patsy Turner proved a retaliatory motive for her discharge, she would be entitled only to money damages and not to injunctive relief.

We affirm the judgment in favor of Clarcor against Kevin Hess. We reverse the judgment in favor of Patsy Turner against Clarcor. In so ruling, we hold that (1) the evidence supported the trial court's determination that Kevin Hess was terminated through the application of Clarcor's absenteeism policy; (2) Clarcor's nondiscriminatory application of its "inactive employee policy" does not support a claim for retaliatory discharge; (3) the trial court's finding that Clarcor discharged Patsy Turner in retaliation for her exercise of her rights under the Workers' Compensation Act is unsupported by the evidence and cannot stand; and (4) neither plaintiff was entitled to injunctive relief.

Clarcor is a holding company with three main "groups": Consumer Products, Filtration, and Precision Products. J.L. Clark is a division of the Consumer Products group. On July 25, 1991, the three plaintiffs filed complaints to enjoin Clarcor from terminating the plaintiffs effective August 1, 1991.

Kevin Hess' complaint alleged the following. Hess had been with Clarcor for about 12 years. On or about May 29, 1990, he was injured in the course of his employment with J.L. Clark. The injury caused him to miss work. On March 26, 1991, Hess' treating physician released him to work without restrictions. However, Clarcor directed Hess to submit to an examination by Dr. John Koehler. On March 30,

1991, after examining Hess, Dr. Koehler restricted Hess to work involving lifting no more than five pounds at a time.

On April 18, 1991, Clarcor, citing Dr. Koehler's restrictions, refused to allow Hess to return to work. While Hess was disabled, Clarcor refused to pay Hess workers' compensation benefits, instead paying him disability benefits under a group insurance plan directed at employees whose injuries are not work related.

On July 23, 1991, Hess filed a claim for workers' compensation benefits with the Illinois Industrial Commission. In May 1991, Clarcor wrote Hess that Hess would be terminated July 31, 1991, if he did not return to work for 10 consecutive working days prior to August 1, 1991. Clarcor had not offered Hess any type of work since April 1991.

According to the complaint, the threatened termination violated the Workers' Compensation Act and, under *Hartlein*, Hess was entitled to an injunction preventing Clarcor from firing him.

Attached to the complaint was a letter to Hess from Chris Beck, a corporate human resources administrator for Clarcor, informing Hess that his employment would be terminated on July 31, 1991, "under a company policy applicable to all employees who have not performed services for nine months or more." Hess could avoid termination by returning to work for at least 10 consecutive working days prior to August 1, 1991, provided that there was a position for which he was qualified. Beck informed Hess of the consequences of termination, including that, after July 31, 1991, Hess could continue his current medical and dental insurance coverage only if he remitted the appropriate monthly premium.

Patsy Turner's complaint alleged the following. She had been employed by Clarcor for about 24 years. On or about June 19, 1987, she injured her back and knee at work. On September 28, 1987, she filed a claim for workers' compensation benefits with the Illinois Industrial Commission. On September 8, 1989, she was laid off because of work restrictions imposed by her treating physician. Later she started to receive workers' compensation benefits from the Illinois Insurance Guaranty Fund, Clarcor's workers' compensation insurance carrier.

Since January 27, 1989, Turner had been limited to light-duty work. Clarcor had not offered Patsy Turner any type of work since September 1989, and Clarcor's "disability management service" had directed her to seek work elsewhere. On May 1, 1991, Chris Beck notified Turner by letter that, under the new policy, Turner would be terminated on July 31, 1991, unless she returned to work for 10 consecutive working days before August 1, 1991. Robert Luedke, an attorney for the law firm representing Clarcor's insurance carrier, in-

formed Gregory Tuite, Turner's attorney, that she would no longer receive temporary total disability benefits under the Workers' Compensation Act if she refused to look for work elsewhere.

Turner alleged that Clarcor's actions violated the public policy embodied in the Workers' Compensation Act and, that, under *Hartlein*, she was entitled to both preliminary and injunctive relief against the planned discharge.

Attached to the complaint was Robert Luedke's letter of June 11, 1991, to Gregory Tuite. Luedke, of the Rockford firm of Williams & McCarthy, reminded Tuite of a January 7, 1991, conversation, in which the two attorneys discussed Patsy Turner's cooperation with an employment counseling service. Luedke noted the Appellate Court's, Fifth District, decision in *Hartlein*. He also referred Tuite to the recent decision of the Appellate Court, First District, Industrial Commission Division, in *Hayden v. Industrial Comm'n* (1991), 214 Ill. App. 3d 749, holding that an employer may terminate an employee's temporary total disability benefits for refusal to cooperate with rehabilitation efforts. Luedke ended the letter as follows:

"Reading the *Hartlein* and *Hayden* decisions together, it appears that the *Hartlein* decision would restrict J.L. Clark from terminating Ms. Turner from any employment rights she may have at the present time. The *Hartlein* decision expressly limits itself to employment rights and not entitlement to temporary total disability benefits. The *Hayden* decision again reaffirms the employee's duty to cooperate with rehabilitation and the employer's right to terminate total disability benefits for failure to cooperate.

At this point the position of the employer is that any refusal of Ms. Turner to cooperate with Mr. Yep [the rehabilitation counselor] in his job placement efforts will jeopardize Ms. Turner's temporary total disability benefits pursuant to *Hayden*."

Also attached to the complaint was an "initial vocational assessment," dated May 16, 1991, from Christopher Yep of Disability Management Network, the rehabilitation agency, to Robert Luedke. Yep reported that Turner's severe medical restrictions made her unable to go back to work for Clarcor. Since her injury, Turner had attempted several times to return to work; however, her knee problems forced her to stop each time. Yep recommended that Turner attempt to find a job "using transferable skills" by August 1, 1991. Such jobs did exist in the Rockford area.

Charles Turner, Patsy Turner's husband, alleged that, since he injured his back on September 4, 1989, he had been unable to work for

Clarcor. Doctors had limited him to desk jobs, and Clarcor had been unable or unwilling to offer him a desk job. Clarcor was not paying him any workers' compensation benefits.

On or about May 1, 1991, Chris Beck sent Charles Turner a termination letter essentially similar to those she sent Patsy Turner and Kevin Hess. Turner alleged that Clarcor's attempt to discharge him violated the Workers' Compensation Act and that the termination would cause him irreparable injury. He therefore requested that Clarcor be enjoined, temporarily and permanently, from discharging him.

After granting all three plaintiffs temporary restraining orders against the planned terminations, the court consolidated the three cases.

On August 20, 1991, Clarcor answered each complaint. It admitted that Kevin Hess was currently an inactive employee who had not worked more than nine days since June 4, 1990. Clarcor denied that Hess' injury occurred in the course of his employment. The company admitted that Dr. Soriano released Hess for work effective March 26, 1991, but Clarcor stated that, on April 6, 1991, after consultation with Dr. Soriano, Dr. John Koehler restricted Hess to jobs not involving more than five pounds of lifting.

Clarcor admitted that, on April 1, 1991, it was unable to provide Hess with employment consistent with Hess' work restrictions. Because Clarcor's workers' compensation insurance carrier had determined that Hess was ineligible for benefits, the company paid Hess no such benefits; however, Clarcor had been and was now paying Hess benefits under its long-term disability plan.

Clarcor acknowledged sending Hess the May 1, 1991, notice of termination. Clarcor alleged, however, that it did so pursuant to a company policy "applicable to all employees who have not worked for one year or more, regardless of reason."

Clarcor admitted that Patsy Turner had been unable to work since about September 8, 1989, and was placed on leave of absence on that date. She thereafter received temporary total disability benefits under the Workers' Compensation Act. Clarcor admitted on information and belief that, on December 28, 1987, Turner filed an application with the Industrial Commission for the adjustment of her claim.

Clarcor acknowledged that it had not offered Turner work since she went on her leave of absence. The company alleged that this was because it had no available work consistent with her medical restrictions. Clarcor admitted on information and belief that Turner received an initial vocational assessment without Clarcor's knowledge, apparently at the instigation of its workers' compensation insurer. Turner's

lawyer received a letter from Robert Luedke, but Clarcor denied that Luedke was representing or speaking on Clarcor's behalf. As with Kevin Hess, Clarcor admitted that it sent Patsy Turner a letter informing her that she faced termination on August 1, 1991, pursuant to a company policy applicable to all employees who had not worked for 10 consecutive work days within a year.

Clarcor admitted that Charles Turner had been unable to work since he injured his back on or about September 18, 1989. Clarcor asserted that the medical restrictions given Turner as a result of his injury made him incapable of doing any work for which he was otherwise qualified; therefore, Clarcor was not able to offer him any work since the injury. Clarcor admitted sending Charles Turner a letter stating that he was subject to the company's general policy of terminating employees who have been inactive for a year. On or about May 3, 1991, Clarcor's workers' compensation carrier discontinued Charles Turner's temporary total disability benefits because of a nonwork-related health condition and not because of his possible termination.

The company alleged that all three plaintiffs had failed to satisfy the requirements for injunctive relief.

On August 20, 1991, the court heard evidence on all the plaintiffs' requests for preliminary injunctive relief. This evidence was later incorporated into the evidence at the hearing on the requests for permanent injunctions.

The plaintiffs called John F. Kissinger as an adverse witness. At all relevant times, Kissinger was director of employee relations for J.L. Clark. His primary responsibility was to consult with Clarcor management about injured J.L. Clark employees to determine what the company should do in each case. He had no role in administering workers' compensation or deciding what workers' compensation insurance the company would carry.

Kissinger stated that the inactive employee policy under which the plaintiffs were to be terminated was primarily the work of David Lindsay, Clarcor's vice-president of benefit services, Chris Beck, a Clarcor personnel administrator, and other people in Clarcor's human resources department. Kissinger attended meetings that led up to the adoption of the policy. He took no notes of these meetings. He did not know the date of the meeting at which the new policy was first discussed.

Plaintiffs' exhibit No. 2, admitted into evidence at the hearing, is "page four" of what appear to be notes from a Clarcor managerial meeting of September 27, 1990. There are eight headings relating to

different aspects of wages and benefits. Under the heading "Workers' Compensation" are these notes:

"Ron Moreau emphasized need to monitor these costs closely.

Policy will be drafted that removes employees from active status after six months off for any reason; benefits, other than those required by law, will be terminated at that time."

Kissinger could not remember whether he had ever seen plaintiffs' exhibit No. 2. He explained that Ron Moreau was vice-president of Clarcor's consumer products group. Kissinger did not attend or recall the September 27, 1990, meeting, although he said that there may have been such a meeting.

Kissinger testified that Clarcor adopted its new inactive employee policy to contain certain costs, primarily medical insurance. Formerly, employees who went on inactive leave remained covered by group medical insurance for which the company paid most of the cost. Under the new policy, workers who were terminated because they had been inactive for a year could continue to receive this medical insurance, but would have to pay the whole premium themselves.

When the new policy was discussed at meetings, no one made any comparison of the respective costs of workers' compensation and long-term disability insurance. The new policy did not distinguish between employees who were inactive because of work-related injuries (and thus drew workers' compensation) and those who were inactive for other reasons (and thus received long-term disability benefits). Employees terminated under the new policy would continue to draw workers' compensation or long-term disability benefits, as the case might be.

Kissinger admitted he had seen a copy of plaintiffs' exhibit No. 1, a letter dated May 19, 1991, from David Lindsay to "general managers" and "personnel managers." The letter summarized the process that led to adoption of the final draft of the corporate policy manual. Each person who received a copy of the letter also received a copy of the draft manual. The manual provided guidelines for divisional practices and procedures; Clarcor wished these practices and procedures to be as uniform as possible among the divisions. Lindsay's letter advised each division to implement these employee-related practices and procedures to the extent that the division had not already done so.

Kissinger and other divisional managers had received copies of the new manual within a few weeks of the hearing. Kissinger did not know precisely what information employees had received. However, as the managers had received copies of the manual so recently, the employees had not yet been given copies of the manual,

and supervisors and foremen had not been able to educate employees about changes in policy.

Kissinger was aware that all three plaintiffs had filed workers' compensation claims. He did not know the current status of Patsy Turner's claim. He was aware that Kevin Hess' case was still pending before the Industrial Commission. Kissinger did not know whether Charles Turner was currently receiving workers' compensation benefits.

Kissinger regularly referred injured employees for initial treatment to Dr. Koehler of Physicians Immediate Care of Rockford. He would consult with Dr. Koehler on whether employees who had been absent because of injuries should be allowed to return to work.

Kissinger received a March 26, 1991, report from Dr. Soriano and an April 19, 1991, report from Dr. David L. McCarty. Both doctors released Hess to return to work. As he had done with other employees who had received work releases from their physicians, Kissinger referred Hess to Dr. Koehler. Dr. Koehler told Kissinger that Dr. Soriano had released Hess because Hess had not followed Soriano's instructions on "work hardening" (rehabilitation). Dr. Koehler placed major work restrictions on Hess. Kissinger did not recall Hess disputing these work restrictions, and Hess used a letter from Dr. Koehler detailing the restrictions to obtain public assistance. The company had not offered Hess any work since the releases.

Kissinger did not know when Hess filed for workers' compensation. Clarcor's insurance carrier had disputed whether Hess' injury was work related; Kissinger was not involved in this dispute. Because his claim was disputed, Hess was receiving long-term disability benefits, not workers' compensation benefits.

Patsy Turner was working for the Precision Products group when she injured her knee in June 1987. She was able to work in Precision Products after her injury, but, in 1989, Precision Products moved from Rockford to Fort Wayne, Indiana. Because she could not move to Fort Wayne, Turner attempted to work in Consumer Products in Rockford. However, after two or three days in Consumer Products, Turner told the company that her knee problems made her unable to work there. In September 1989, she went on leave and started receiving workers' compensation, all ultimately the result of her 1987 injury. Since Turner became inactive in September 1989, Clarcor has not offered her any employment.

Kissinger testified that Clarcor was unable to find any jobs with the company that Turner could perform. Since September 1989,

Turner had never asked to return to work and had never submitted a doctor's note declaring that she was fit to return to work.

According to Kissinger, Charles Turner, Patsy Turner's husband, had worked for Clarcor for 36 years. Since being injured in August 1989, Turner had done less than three full days of work. From July 30 to August 2, 1990, Turner tried to work as a trimmer slitter operator, but he told Clarcor that he was physically unable to continue with that job. Since then, he had not tried to return to work, and Clarcor had offered him no work. Kissinger stated that, as of the time of the hearing, Clarcor had no work that it believed Turner could do. By Turner's admission, he had been unable to work since September 18, 1989.

Turner had received workers' compensation after his August 1989 injury, but Clarcor's insurer eventually decided to discontinue payments. Kissinger was not involved in the insurer's decision; to his knowledge, the insurer's decision to discontinue Turner's workers' compensation payments was unrelated to Turner's termination under the new inactive employee policy.

Robert Luedke testified that his law firm represented Clarcor's workers' compensation insurance carrier in the Patsy Turner case. Generally, Luedke's firm represented both the employer and the insurance carrier in a workers' compensation case if these clients' interests did not diverge.

Each plaintiff testified. Kevin Hess stated that he had been employed at J.L. Clark since 1979. Hess last worked as a material handler. He injured himself on June 1, 1990. On July 23, 1990, he filed a workers' compensation claim, seeking total disability benefits. In October 1990, he went back to work, but was unable to continue because, as a result of the injury, his leg "went numb on [him] a couple times." Dr. Soriano placed Hess on work restriction, and Hess had not worked for Clarcor since then.

In March 1991, at Hess' request, Dr. Soriano examined Hess' injured leg. Hess testified that he told Dr. Soriano that the leg was still bothering him; however, Hess also testified that his leg was not bothering him in March 1991 and that Dr. Soriano wanted to recheck Hess' leg in the course of a regular doctor's appointment. After Dr. Soriano made his examination, he told Hess that there was nothing more that he (the doctor) could do. Dr. Soriano gave Hess a work release, which Hess gave to Kissinger. Kissinger then referred Hess to Dr. Koehler, who placed substantial work restrictions on Hess. At Hess' request, Dr. Koehler prepared a letter, admitted into evidence at the hearing, stating that Hess was unable to work.

Hess requested the letter so that he could obtain public assistance from the Social Security Administration. His application for public aid was still pending at the time of the hearing.

Clarcor's insurer refused to pay Hess workers' compensation. After his workers' compensation claim was denied, Hess started to receive long-term disability benefits from Clarcor. Hess was still receiving these benefits at the time of the hearing, and he acknowledged that the letter notifying him of his impending termination stated that even after he was terminated he would continue to receive long-term disability benefits.

Hess testified that Clarcor had offered him no work since March 1991. When asked what type of work he would be able to perform in his department, Hess replied "[m]aybe [one type of job in] Plastics, but that would be about it." However, he also testified that he was not presently disabled. Although he had not informed the Social Security Administration that he was no longer disabled, Hess said that he would not accept the benefits for which his application was still pending.

Patsy Turner's account of her employment and disability history was consistent with John Kissinger's account. In June 1987, she injured her knee and back. She did not go off work until September 1987. She filed for workers' compensation and received it without opposition from Clarcor or Clarcor's insurer. After surgery in 1987, Turner attempted to return to work. However, her knee problems were so severe that, when the Precision Products group relocated to Fort Wayne, Turner's medical restrictions prevented her from working in the job that Clarcor gave her with the Consumer Products group in Rockford. In September 1989, therefore, Turner went on the disability leave from which she did not return.

After going on leave, Turner continued at first to receive workers' compensation benefits. When she stopped receiving these benefits early in 1990, she applied for social security benefits; as part of this application, she claimed she was unable to work. At the time of the hearing, the claim was still pending. Since filing for social security benefits, Turner had had her workers' compensation benefits reinstated. At the time of the hearing, she was receiving these benefits, and she understood that she would continue to do so even after termination.

Turner had met several times with Mr. Yep of the rehabilitation service. Yep was trying to find her a job but had not done so yet.

Charles Turner testified that he was injured in August 1990. Since then, he had attempted once to return to work but, after

working three partial days, realized that his injury made it impossible to continue working. He told Kissinger that the pain was too great. He had not since attempted to return to work. Turner received workers' compensation until May 1991; at the time of the hearing, his emergency petition to reinstate these benefits was pending before the Industrial Commission. He could not perform his former job as a splitter trimmer operator; even a desk job would be very difficult. No one at Clarcor had told him that he could not reapply for work there.

Clarcor's sole witness at the hearing on preliminary relief was David Lindsay. He explained that Group Services is a fourth group that manages various administrative services for Clarcor's three operating groups. Lindsay had no responsibility for decisions about workers' compensation.

Lindsay stated that Clarcor adopted the new policy because health care costs had been "skyrocketing." The company's medical insurance plan is funded 85% by Clarcor, directly from operating funds, and 15% by employee contributions. The plan operates as self-insurance up to $125,000; an insurance company pays the excess of any claim over that amount. In 1990, Clarcor paid out a total of about $5 million in health and dental benefits. Plaintiff's exhibit No. 11, a company printout dated May 13, 1991, shows that in one 15-month period, Clarcor paid about $278,000 in medical benefits to inactive employees. An October 30, 1990, analysis of the cost of various company benefits (not including workers' compensation benefits) demonstrated that, to purchase equivalent insurance in the marketplace, the average employee would have to pay $3,100 a year. Inactive employees accounted for a large share of Clarcor's payroll. The company's funds were limited, and it needed to continue to provide medical benefits to its productive employees to retain those employees.

Clarcor also paid short-term disability benefits out of operating costs and contributed part of the costs of providing long-term disability benefits. An employee need not remain on the company payroll to keep receiving long-term disability payments, because those payments continue for as long as a person qualifies up to age 65.

In May or June 1990, Lindsay first became involved in the development of the new inactive employee policy, when he and a benefits consultant began to review Clarcor's benefit policies. The consultant told Lindsay that Clarcor's treatment of employees who were not working was out of line with what the consultant knew of industry practices.

In September 1990, Lindsay discussed the possible new policy at an *ad hoc* personnel management meeting that covered many other subjects. At an October 1990 meeting of the same group, Lindsay presented a draft of the new proposal. On February 22, 1991, a top-level management meeting which Lindsay attended officially adopted the policy in its current form. When Lindsay spoke at this meeting, he had a general idea of how many Clarcor employees were on inactive status, but he did not know how many of these inactive employees were receiving workers' compensation. No one at the meeting asked him about the composition of the inactive employee group.

Shortly after management approved the new policy, Lindsay investigated who was inactive and the reason for that status in each case. The purpose of the investigation, which Lindsay undertook on advice of counsel, was to ensure that Clarcor did not inadvertently discriminate on the basis of age, gender, race, or reason for disability. Lindsay's summary of his investigation (admitted into evidence) shows that, as of May 1991, there were 46 employees on inactive leave; 23 were drawing workers' compensation, and 23 were receiving long-term disability payments. Lindsay acknowledged at the hearing that some of the 23 employees receiving long-term disability benefits may have filed workers' compensation claims that Clarcor's carrier disputed.

The new policy became effective April 19, 1991. Lindsay described how the policy operates. An employee who is not actively at work for three months is officially placed on inactive status. If the employee does not return to active status within nine months, he or she is terminated, regardless of the reason that the employee is unable to work. Termination does not discontinue either workers' compensation benefits or long-term disability benefits.

On September 4, 1991, the trial court entered a preliminary injunction for Patsy Turner. Finding Turner's case factually similar to *Hartlein*, the court enjoined Clarcor from terminating Patsy Turner until further court order. The court denied preliminary injunctions to Kevin Hess and Charles Turner. On October 1, 1991, Clarcor filed its notice of interlocutory appeal (see 134 Ill. 2d R. 307(a)(1)) from the grant of preliminary relief to Patsy Turner.

On October 15, 1991, the court heard evidence on the plaintiffs' requests for permanent relief. By stipulation, this hearing incorporated all the evidence from the previous hearing. Patsy Turner, Robert Luedke and David Lindsay testified further.

Patsy Turner stated that she was still cooperating with the vocational rehabilitation program, although she had yet to receive any job interviews. No one at J.L. Clark ever told her that she was being terminated for refusal to cooperate with the rehabilitation program. However, about two weeks before the hearing, the rehabilitation service told her she would stop receiving workers' compensation unless she looked for a job.

Turner acknowledged that she had applied to the Social Security Administration for permanent disability benefits. On September 26, 1991, she received a notice of a decision in her favor. The decision awarded her almost two years' benefits. The notice stated that the Federal agency had found that Turner's injuries prevented her from returning to her previous work or performing any available alternative work. Turner admitted that the decision was based in part on her testimony and evidence before the Federal agency.

Robert Luedke testified that nowhere in his letter of June 11, 1991, to Gregory Tuite did he suggest that Patsy Turner would be terminated if she did not cooperate with rehabilitation efforts. When he was preparing this letter, Luedke knew nothing of Clarcor's personnel policy and was not aware of the new inactive employee policy. He did not consult with anyone at Clarcor prior to sending Tuite the letter. About a year or more before the hearing, he and John Kissinger did discuss whether Patsy Turner might return to light work with Clarcor. This was the only time he discussed her case with anyone from Clarcor.

Luedke stated that Clarcor's workers' compensation insurance carrier, not Clarcor, retained his firm in Patsy Turner's case. He acknowledged that the parties in Patsy Turner's workers' compensation included Turner and J.L. Clark, but not the insurance carrier, and that he filed an appearance as attorney for J.L. Clark. However, Luedke explained that his representation of J.L. Clark in the case was limited to the issue of Turner's eligibility for workers' compensation.

Clarcor's insurance carrier approved Luedke's decision to retain the rehabilitation service. Normally, the insurer would retain a rehabilitation service only if the injured employee was not expected to return to work for her present employer. Such vocational rehabilitation was customary for workers who could not return to their jobs, but who could still be employed in some capacity. The insurer and Luedke did not believe that Patsy Turner could go back to work at Clarcor, but they believed that she might be able to work elsewhere. Luedke was aware that the Social Security Administration

had found that Turner was permanently disabled; however, the workers' compensation claim would not be decided under the legal standards that the Federal agency used.

David Lindsay testified that Patsy Turner was terminated for the same reason as Charles Turner and Kevin Hess: the new policy. Lindsay stated that Turner's discharge was not related to her workers' compensation claim or her participation (or nonparticipation) in vocational rehabilitation. Lindsay never discussed Turner's discharge with Luedke, and he never talked with Luedke or anyone else about the continuation or discontinuation of Turner's workers' compensation benefits. John Kissinger, not Lindsay, decided to refer Turner to Dr. Koehler, and Kissinger, as the manager of Turner's particular department, decided to place Turner on inactive status.

After argument, the trial judge denied Kevin Hess and Charles Turner permanent injunctive relief. However, the court granted Patsy Turner a permanent injunction against discharge.

The judge referred the parties to his finding after the hearing on preliminary injunctive relief that Hess and Charles Turner were discharged solely on the basis of a policy that (1) did not discriminate against employees receiving workers' compensation and (2) was based solely on economic reasons relating to the cost of carrying employees who were inactive for any reason.

The judge concluded, however, that Clarcor discharged Patsy Turner -solely in retaliation for her workers' compensation claim. The judge explained, as he had in granting Patsy Turner a preliminary injunction, that he believed her case was factually on point with *Hartlein*. At the end of the earlier hearing, the judge emphasized Robert Luedke's letter of June 11, 1991, to Turner's lawyer, Gregory Tuite; in particular, the judge noted that the letter stated that Turner's workers' compensation benefits would end if she did not cooperate with vocational rehabilitation. Because Turner cooperated with vocational rehabilitation, the judge concluded that Clarcor's claim of a nondiscriminatory discharge had not been established.

On appeal, both Kevin Hess and Clarcor assert that Hess' termination is legally indistinguishable from Patsy Turner's discharge and that the two cases should have been decided the same way. Hess claims that his discharge should have been enjoined under the reasoning of *Hartlein*; Clarcor argues that Patsy Turner's case is distinguishable from *Hartlein*, and that, even if *Hartlein* is not distinguishable, this court should refuse to follow the fifth district's

course. Since the supreme court has now rejected the holding of the fifth district, the *Hartlein* rational is preempted.

■■ To prevail on a claim of retaliatory discharge, a plaintiff must prove that (1) he was discharged; (2) in retaliation for his activities; and (3) the discharge violated a clear mandate of public policy. (*Hinthorn v. Roland's of Bloomington, Inc.* (1988), 119 Ill. 2d 526, 529; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172.) In *Kelsay*, the supreme court first recognized that an employee who is discharged in retaliation for filing or pursuing a workers' compensation claim may recover in tort against the offending employer. The court based its analysis not on any particular section of the Workers' Compensation Act, but on the public policy embodied in the statute. The *Kelsay* court explained that in Illinois, as elsewhere, workers' compensation law replaced common-law tort principles as the result of a compromise: employers surrendered certain rights, such as numerous common-law defenses, and employees surrendered the common-law right to sue their employers in tort before juries that might be biased toward the employees. (*Kelsay*, 74 Ill. 2d at 180-81.) To allow employers to discharge employees for the exercise of the employees' rights under the statute would enable employers to reap all the benefits of this compromise while avoiding most of the burdens. Therefore, *Kelsay* carved out an exception to the general rule that an employer may fire an at-will employee for any reason or for no reason at all. *Kelsay*, 74 Ill. 2d at 181-83.

Nonetheless, retaliatory discharge is a narrowly defined cause of action. (*Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 525; *Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 209 (Reinhard, J., specially concurring).) A plaintiff must prove that his discharge was causally connected to his exercise of rights under the Workers' Compensation Act. (*Kritzen v. Flender Corp.* (1992), 226 Ill. App. 3d 541, 549.) Causality is lacking if the basis for the discharge is valid and nonpretextual. (*Slover v. Brown* (1986), 140 Ill. App. 3d 618, 621.) Thus, an employer may fire an employee for excessive absenteeism, even if the absenteeism is caused by a compensable injury. (*Marin v. American Meat Packing Co.* (1990), 204 Ill. App. 3d 302, 309; *Slover*, 140 Ill. App. 3d at 621.) An employer is not proscribed from discharging an employee who is physically unable to perform his work. (*Wright v. St. John's Hospital* (1992), 229 Ill. App. 3d 680, 688; *LaPorte v. Jostens, Inc.* (1991), 213 Ill. App. 3d 1089, 1093.) Furthermore, the employer is not required to find a new job for an employee who is physically unable to do his original

job. *Carter v. G C Electronics* (1992), 233 Ill. App. 3d 237, 244; *Wright*, 229 Ill. App. 3d at 688; *LaPorte*, 213 Ill. App. 3d at 1093.

■ Generally, a party seeking a temporary injunction must show an ascertainable right in need of protection, a likelihood of success on the merits, an inadequate remedy at law, and an irreparable injury. (*Witter v. Buchanan* (1985), 132 Ill. App. 3d 273, 279.) The decision to grant or deny a preliminary injunction is a matter of the trial court's discretion; however, where a preliminary order effectively decides the merits of the case, we consider whether the trial court's findings are against the manifest weight of the evidence and whether the court erred legally. (*Witter*, 132 Ill. App. 3d at 279.) A permanent injunction is designed to extend or maintain the status quo indefinitely after a hearing on the merits, where it has been shown that there is no adequate remedy at law and that the plaintiff is suffering irreparable harm. *American National Bank & Trust Co. v. Carroll* (1984), 122 Ill. App. 3d 868, 881.

■ With these principles in mind, we conclude that the trial court correctly found that Kevin Hess did not prove that Clarcor attempted to discharge him in retaliation for his having filed a workers' compensation claim. The record demonstrates clearly that Hess was terminated under the new absenteeism policy, that is, he was terminated for excessive absenteeism. Even though that excessive absenteeism resulted from a compensable injury, the resulting termination was not retaliatory. (See *Slover*, 140 Ill. App. 3d at 621.) Moreover, Hess admitted that, at the time of his termination notice (and at the time that his termination would actually have taken effect), he was physically unable to perform his job. In line with precedent, we decline to hold that an employer must retain an employee who is physically unable to do his work.

Were there clear evidence Clarcor's new absenteeism policy was an ostensibly neutral scheme that actually had the purpose and effect of penalizing employees for filing workers' compensation claims, we might look beyond the form of the policy and discern retaliation in fact. However, the trial judge properly credited evidence that the policy was facially neutral, that Clarcor adopted the policy for a legitimate business purpose, and that Clarcor applied the policy evenhandedly to any employee who had been inactive for the requisite period of time—whether or not the inactivity was the result of injuries compensable under the Workers' Compensation Act.

Thus, Clarcor's inactive employee policy, however harsh, did not violate public policy as defined in *Kelsay* and its progeny. The com-

pany's decision to terminate Kevin Hess was akin to a termination resulting from a general reduction in force, which is not prohibited. See *Groark v. Thorlief Larsen & Son, Inc.* (1992), 231 Ill. App. 3d 61; *Armstrong v. Freeman United Coal Mining Co.* (1983), 112 Ill. App. 3d 1020, 1022.

Moreover, although the precise issue has not arisen in Illinois' courts, courts in numerous other jurisdictions have concluded that the discharge of a worker who has filed a claim for workers' compensation is permissible if the discharge is the result of the nondiscriminatory application of a facially neutral absenteeism policy. See, e.g., *Hayden v. Bruno's, Inc.* (Ala. 1991), 588 So. 2d 874; *Chiaia v. Pepperidge Farm, Inc.* (1991), 24 Conn. App. 362, 588 A.2d 652; *Smith v. Electrical System Division of Bristol Corp.* (Ind. App. 1990), 557 N.E.2d 711; *Clifford v. Cactus Drilling Corp.* (1984), 419 Mich. 356, 353 N.W.2d 469; *Mitchell v. St. Louis County* (Mo. App. 1978), 575 S.W.2d 813; *Galante v. Sandoz, Inc.* (1983), 192 N.J. Super. 403, 470 A.2d 45; *Duncan v. New York State Developmental Center* (1984), 63 N.Y.2d 128, 470 N.E.2d 820; 481 N.Y.S.2d 22; *Barker v. Dayton Walther Corp.* (1989), 56 Ohio App. 3d 1, 564 N.E.2d 738; *Wilmot v. Kaiser Aluminum & Chemical Corp.* (1991), 118 Wash. 2d 46, 821 P.2d 18; *Yoho v. Triangle PWC, Inc.* (W. Va. 1985), 336 S.E.2d 204.

A few jurisdictions prohibit the discharge, even pursuant to a neutral absenteeism policy, of an employee who has pursued a workers' compensation claim. (See *Judson Steel Corp. v. Workers' Compensation Appeals Board* (1978), 22 Cal. 3d 658, 586 P.2d 564, 150 Cal. Rptr. 250; *Coleman v. Safeway Stores, Inc.* (1988), 242 Kan. 804, 752 P.2d 645; *Lindsay v. Great Northern Paper Co.* (Me. 1987), 532 A.2d 151.) We decline to follow these cases, as they rely on the *effect* of the policy on workers and reject the rule of *Kelsay* that the employee seeking to recover for retaliatory discharge must prove retaliatory *intent* on the part of the employer. These cases thus reject the holding of Illinois' courts that an employee may be discharged for excessive absenteeism, even if the absenteeism is the result of a compensable injury. Finally, no case we have found penalized the employer for terminating an employee who was physically unable to do his work, and courts in two of the three jurisdictions cited in this paragraph have stated explicitly that an employer need not retain an employee who is physically unable to perform or for whom there is no longer an available position. *Judson*, 22 Cal. 3d at 667, 586 P.2d at 569, 150 Cal. Rptr. at 255; *Rowland v. Val-Agri, Inc.* (1988), 13 Kan. App. 2d 149, 153, 766 P.2d 819, 822.

We find no reason to disturb the trial court's decision to deny a permanent injunction to Kevin Hess.

We next turn to Clarcor's argument that the trial court erred in holding that Clarcor attempted to terminate Patsy Turner in retaliation for her having pursued a workers' compensation claim.

■ After a full review of the record, we find, as Clarcor argues, that the cases of Patsy Turner and Kevin Hess are legally indistinguishable. Each termination was the result of Clarcor's facially neutral and evenhandedly applied absenteeism policy. The termination notices to Hess and Turner (and the notice to Charles Turner) went out at the same time, specified the same reason for each termination, and gave August 1, 1991, as the date for each employee's planned termination. In each case, the employee could have avoided termination by becoming an "active" employee as defined under the new policy. In each case, the employee did not become "active" within the time required by the policy, and Clarcor terminated the employee.

We find that the trial court's finding that Clarcor discharged Patsy Turner in retaliation for her exercise of rights under the Workers' Compensation Act is both against the manifest weight of the evidence and legally erroneous. We therefore reverse both the preliminary injunction and the permanent injunction in favor of Patsy Turner.

■ This district has followed the general rule that a court will not compel an employer to retain an employee in its service. (*Kurle v. Evangelical Hospital Association* (1980), 89 Ill. App. 3d 45, 53-54; see also *Witt v. Forest Hospital, Inc.* (1983), 115 Ill. App. 3d 481, 487-88; *Zannis v. Lake Shore Radiologists, Ltd.* (1979), 73 Ill. App. 3d 901, 904.) This rule is in line with Federal holdings that, absent a statutory requirement of reinstatement or truly extraordinary circumstances, a court will not compel an employer to retain an employee or reinstate a discharged employee. *Sampson v. Murray* (1974), 415 U.S. 61, 88-92, 39 L. Ed. 2d 166, 185-88, 94 S. Ct. 937, 951-53; *American Postal Workers Union v. United States Postal Service* (2d Cir. 1985), 766 F.2d 715, 720-21.

The general rule is rooted in two main considerations: (1) money damages are ordinarily considered adequate compensation for the loss of employment, even given the possible attendant stigma or difficulties in finding new work (see *Sampson*, 415 U.S. at 92 n.68, 39 L. Ed. 2d at 187 n.68, 94 S. Ct. at 953 n.68; *Kurle*, 89 Ill. App. 3d at 55 (Seidenfeld, J., specially concurring)); and (2) courts are not well suited to enforce a continuing relationship be-

tween parties who have become hostile to one another, especially (though not only) where that relationship requires trust and confidence (*Kurle*, 89 Ill. App. 3d at 54).

In sum, we affirm the trial court's denial of relief to Kevin Hess, and we reverse the trial court's grant of preliminary and permanent injunctive relief to Patsy Turner.

The judgments of the circuit court of Winnebago County are affirmed as to Kevin Hess and reversed as to Patsy Turner.

No. 2—91—1100, Affirmed as to Kevin Hess; reversed as to Patsy Turner.

No. 2—91—1296, Reversed.

No. 2—91—1336, Affirmed.

UNVERZAGT and BOWMAN, JJ., concur.