CROPMATE COMPANY, d/b/a UAP Richter, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Jeffrey Pinkerton, Appellee).

Fourth District   No. 4—99—0377WC

Argued February 15, 2000.—Opinion filed April 25, 2000.

RAKOWSKI, J., specially concurring.

James A. Thoenen, of Evans & Dixon, of St. Louis, Missouri, for appellant.

Dan E. Way, of Springfield, for appellee.

JUSTICE RARICK delivered the opinion of the court:

Claimant, Jeffrey Pinkerton, sought benefits pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1994)) for injuries sustained while in the employ of Cropmate Company (Cropmate). Claimant worked for his uncle, William Pinkerton (Pinkerton), who was erecting a pole building for Cropmate. On August 15, 1994, while working on the roof of the building, claimant slipped and sustained a severe laceration to his right forearm.

Pinkerton contracted with Cropmate to erect a chemical containment building on Cropmate's property in White Hall, Illinois, as

required by the Environmental Protection Agency (EPA) and the Illinois Department of Agriculture. The building was to be used for the storing, loading, and unloading of materials utilized by Cropmate in its business. Cropmate was in the business of manufacturing, selling, delivering, and applying pesticides and insecticides.

Cropmate solicited bids for the erection of the structure and received a bid from Pinkerton of $7,000. Half was to be paid when Pinkerton began the work and half would be paid upon completion. Initially, the agreement was verbal. Several weeks after starting the project, Pinkerton requested the first $3,500. At that time, Pinkerton was asked to sign a written contract. He was provided a form contract by Marla Droves, Cropmate's secretary. Although the contract contained various boilerplate clauses, none of the particular terms were filled in. Pinkerton went ahead and signed the contract. Included in the boilerplate language was a provision that the contractor, Pinkerton, would obtain workers' compensation insurance. The contract appears to be dated August 3, 1994, but it is unclear.

Cropmate obtained the funds to erect the building from its parent company, ConAgra. Cropmate hired Larry Houston, an environmental coordinator, to provide plans and blueprints, which were approved by ConAgra. Larry Meyer, comanager of Cropmate, testified that the building would be considered a capital asset and that Cropmate received benefits from the building. He further testified that Cropmate would not be in compliance with environmental and Department of Agriculture regulations unless the building was built. He also testified that the materials to be stored in the containment building were not toxic, but some were hazardous.

Pinkerton testified that both Meyer and Richard Meaks, Cropmate's other comanager, inquired as to whether he had workers' compensation insurance. He told them that he did not. Meyer and Meaks told him he had to obtain workers' compensation insurance before they would tender final payment to him. Pinkerton further testified that at no time did any agent of Cropmate tell him to stop erection of the structure. Pinkerton stated that, at the time of the accident, he was in the process of obtaining workers' compensation insurance but had not done so.

Meyer testified that he knew Pinkerton did not have workers' compensation insurance at the time Cropmate accepted Pinkerton's bid, and Meyer made no attempt during the erection of the structure to verify that Pinkerton had obtained workers' compensation insurance. Meaks testified that he discussed insurance, but not necessarily workers' compensation insurance, with Pinkerton. He stated that at no time prior to or during the erection of the structure did he make

any attempt to verify whether Pinkerton had workers' compensation insurance. Both Meyer and Meaks denied telling Pinkerton that he would not receive final payment until he obtained workers' compensation insurance.

Pinkerton testified that Cropmate provided the materials to build the structure, consisting of a prefabricated building, and that Meyer and Meaks provided a floor plan for the structure and were present at the worksite on a daily basis, conferring with Pinkerton on the progress on erecting the structure and on compliance with EPA and Department of Agriculture regulations.

On August 15, 1994, claimant, who was right-handed, fell from the top rafters of the structure, nearly severing his right arm. He was taken to Passavant Hospital and then to Memorial Medical Center, where he came under the treatment of Dr. Richard Brown. Claimant underwent extensive reconstructive surgery, including the reattachment of the totally severed radial nerve and brachial artery. He subsequently underwent 18 months of follow-up care, including physical therapy. Claimant also saw Dr. K. Buescher, who treated him for nightmares and coping problems. On September 30, 1994, Dr. Brown told claimant he should seek other employment. Claimant was released from Dr. Brown's care in December 1995, with instructions to return as needed. Claimant undertook a job search. Although unsuccessful at first, he ultimately found work as a general laborer on December 15, 1995.

A functional capacity evaluation revealed a significant loss of grip strength, sensation, and motion. Dr. Brown testified that this condition was permanent. Claimant testified that the loss of sensation has resulted in his inability to use various tools.The arbitrator ruled that claimant was a statutory employee of Cropmate pursuant to section 3 of the Act (820 ILCS 305/3 (West 1994)). The arbitrator found that Cropmate owned the building in question, the building was required by environmental regulations, and it was a necessary and essential enterprise from which Cropmate derived substantial revenue. The arbitrator further found that Pinkerton was an uninsured contractor and that agents of Cropmate knew prior to and during the erection of the building that Pinkerton did not have workers' compensation insurance.

The arbitrator also concluded that claimant's condition of ill-being was causally connected to his work-related accident. This conclusion was based upon Dr. Brown's testimony to that effect and the lack of any prior injuries to the arm.

The arbitrator found that claimant had sustained a permanent loss of use of the right arm to the extent of 70% thereof. The arbitra-

tor also found that claimant was entitled to $69^5/_7$ weeks of temporary total disability (TTD) benefits, for the period from August 15, 1994, through November 6, 1997. The arbitrator's decision was affirmed and adopted by the Industrial Commission (Commission). The Commission's decision was confirmed by the circuit court of Greene County.

On appeal, Cropmate argues first that the Commission erred as a matter of law in determining that claimant was its "statutory employee." Cropmate maintains that it was not in the business of erecting buildings or any of the other activities listed in subsections 1 and 2 of section 3 of the Act.

■ Section 3 of the Act provides in pertinent part:

"The provisions of this Act hereinafter following shall apply automatically and without election to the State, county, city, town, township, incorporated village or school district, body politic or municipal corporation, and to all employers and all their employees, engaged in any department of the following enterprises or businesses which are declared to be extra hazardous, namely:

1. The erection, maintaining, removing, remodeling, altering[,] or demolishing of any structure.

2. Construction, excavating[,] or electrical work." 820 ILCS 305/3 (West 1994).

Cropmate contends that if it is found to be a statutory employer under these circumstances, then any owner having work done on its property by a contractor would be liable for injuries to the contractor's employees.

In determining that claimant was a statutory employee of Cropmate, the Commission relied on *Fefferman v. Industrial Comm'n*, 71 Ill. 2d 325, 375 N.E.2d 1277 (1978). In *Fefferman*, the Feffermans, owners of a building, contracted with Dixon Wrecking Company, an uninsured contractor, to demolish the structure. An employee of Dixon's, Otha Butts, was injured as a result of a fall. The issue on appeal was whether Fefferman was engaged in the business of maintaining or demolishing a structure as enumerated in section 3 of the Act (Ill. Rev. Stat. 1973, ch. 48, par. 138.3 (now 820 ILCS 305/3 (West 1994))). The court concluded that Fefferman was an employer engaged in the extra-hazardous business of maintaining a structure and was therefore liable under section 3 of the Act for Butts' injuries. The court held that Fefferman was in the business of general merchandise, textiles, government surplus, and hospital supplies; the building was a capital asset used for storage of its goods; and it figured prominently, even if indirectly, in the revenue Fefferman received from its business.

Cropmate attempts to distinguish *Fefferman* by arguing that, in *Fefferman*, the court found that Fefferman was maintaining a

structure "by virtue of the nature of the storage business." Nothing in the facts in *Fefferman* supports Cropmate's characterization of Fefferman's business as a "storage" business. Rather, the building was used for storage of Fefferman's mercantile goods. Further, the determining factor in *Fefferman* was not the nature of the business, but the fact that the structure contributed to the revenue Fefferman derived from his business.

The court in *Fefferman* relied on *Pulliam v. Industrial Comm'n*, 43 Ill. 2d 364, 253 N.E.2d 448 (1969). In *Pulliam*, the owner of a funeral home was found to be maintaining a structure within the purview of section 3 of the Act. An employee was injured in a fall from a ladder while painting the funeral home. The court reasoned that the use of the building figured prominently in the revenues the owner received from his business. The court in *Fefferman* also noted that *Pulliam* effectively overruled a previous line of cases insofar as those cases held that maintaining a building as an incident to a business did not constitute maintaining a structure under the Act.

In another similar case, *Graphic Group & KLW, Inc. v. Industrial Comm'n*, 167 Ill. App. 3d 1041, 522 N.E.2d 128 (1988), Graphic Group engaged William Dorsch to paint and plaster its office. Dorsch subsequently employed Mark Londinski, the claimant, to do one day's worth of painting. While so engaged, claimant sustained a fracture to his lower left leg. Dorsch did not carry workers' compensation insurance. The Commission determined that Graphic Group was a statutory employer and liable for workers' compensation benefits. On appeal, Graphic Group argued that it was not the statutory employer of the claimant because it was not engaged in the business of maintaining a structure. The court rejected this argument, finding that Graphic Group's offices indirectly contributed to the revenue received by the business and that Graphic Group was therefore maintaining a structure within the meaning of section 1(a)(3) of the Act.

■ Both *Fefferman* and *Graphic Group* are directly on point. The facts in those cases are identical to those in the present case in all meaningful aspects. The building being erected for Cropmate was to be used for the storage of materials it used in its business. Indeed, the erection of the building was required by the EPA for storage of such materials. Once built, Cropmate would derive revenue, albeit indirectly, from the building. Meyer testified that the building would be a capital asset of Cropmate. Cropmate's argument that section 3 does not apply because erection or maintenance of a structure was not its principal business was specifically rejected by our supreme court in *Fefferman*. The Commission correctly determined that claimant was a statutory employee of Cropmate pursuant to section 3 of the Act.

■ Cropmate next argues that the Commission's determination that claimant sustained a 70% permanent partial disability (PPD) is contrary to the manifest weight of the evidence. Cropmate contends that as of claimant's last visit to Dr. Brown on September 27, 1996, his complaints were minimal and Dr. Brown felt that he had made a good recovery. Claimant has some use of his right hand, is able to drive an automobile, and is not on any restricted duty. Cropmate urges us to reduce claimant's PPD award to 30%.

It is well settled that the extent of a claimant's disability is a question of fact to be determined by the Commission, and its decision will not be set aside unless contrary to the manifest weight of the evidence. *Bryant v. Industrial Comm'n*, 250 Ill. App. 3d 659, 662, 621 N.E.2d 198, 200 (1993). In the present case, claimant, who was right-hand dominant, now must use his left hand to perform even the most routine functions. His grip strength and sensation in his right hand and arm are all significantly diminished. Indeed, claimant's loss of sensation was so significant that Dr. Brown testified that it would be considered a total loss of sensation pursuant to American Medical Association guidelines. The Commission's decision is well supported by the evidence.

■ Finally, Cropmate argues that the Commission's award of 69⁵/₇ weeks of TTD benefits was contrary to the manifest weight of the evidence. Cropmate contends that claimant's condition had stabilized as of September 30, 1994, when Dr. Brown told him that he should start thinking about other types of work. Cropmate maintains that statements made to Drs. Brown and Buescher demonstrate that claimant was capable of working, but chose not to so as not to damage his workers' compensation case.

To be entitled to TTD benefits, a claimant must show not only that he did not work, but that he was unable to work, and the duration for which he was unable to work. *Ingalls Memorial Hospital v. Industrial Comm'n*, 241 Ill. App. 3d 710, 716, 609 N.E.2d 775, 780 (1993). Whether a claimant was unable to work and the duration for which he was unable to work are questions of fact for the Commission, and its determination thereon will not be set aside on review unless contrary to the manifest weight of the evidence. *City of Granite City v. Industrial Comm'n*, 279 Ill. App. 3d 1087, 1090, 666 N.E.2d 827, 828-29 (1996).

In the present case, claimant's arm was nearly severed in the August 15, 1994, accident. Although Dr. Brown told claimant on September 30, 1994, that he should "start thinking about other work," he did not release him to work. Dr. Brown testified that claimant was totally disabled from the date of the accident through September 26,

1995, and that he was not at maximum medical improvement until that date. Cropmate produced no evidence, medical or otherwise, to the contrary. Claimant testified that he had sought work but, because of his physical limitations, was unable to find employment until December 15, 1995. The Commission's TTD award is not contrary to the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Greene County is affirmed.

Affirmed.

McCULLOUGH, P.J., and COLWELL and HOLDRIDGE, JJ., concur.

JUSTICE RAKOWSKI, specially concurring:

While the majority correctly follows *Fefferman*, I assert that the *Fefferman* holding is a misstatement of the precedent that it is purportedly based on as well as a perverse interpretation of section 3 of the Act (820 ILCS 305/3 (West 1994)). Accordingly, I write separately.

The language at issue in section 3 is clear and unambiguous. It states:

"The provisions of this Act hereinafter following shall apply automatically and without election to *** all employers and all their employees, engaged in any department of the following *enterprises or businesses* which are declared to be extra hazardous, namely:

1. The erection, *maintaining*, removing, remodeling, altering[,] or demolishing of any structure." (Emphasis added.) 820 ILCS 305/3 (West 1994).

Prior to *Fefferman*, the supreme court had consistently assigned a commonsense interpretation to the above-emphasized language. In fact, the court in *Walsh v. Industrial Comm'n*, 345 Ill. 366, 178 N.E. 82 (1931), extensively considered the language of section 3, although it had already established the basic principles upon which this case is based. In *Walsh*, the court defined "business" as "an employment which occupies a substantial portion of the time and attention of one engaged in it." *Walsh*, 345 Ill. at 369, 178 N.E. at 83; accord *Iowa-Illinois Gas & Electric Co. v. Industrial Comm'n*, 407 Ill. 360, 366, 95 N.E.2d 482, 486 (1950) (following and quoting *Walsh*). It defined "maintain" as " 'the act of holding or keeping in any particular state or condition.' " *Walsh*, 345 Ill. at 369, 178 N.E. at 83; accord *Iowa-Illinois Gas & Electric Co.*, 407 Ill. at 366, 95 N.E.2d at 486 (following

and quoting *Walsh*). Under these definitions and prior case law, the court held:

> "The line of demarcation between maintaining a structure as an incident rather than as a business, and the business of maintaining a structure, is not readily defined, but we are of the opinion that a safe rule is, that where one maintains buildings or structures for profit, whether that profit be as compensation for his services or by way of rentals received, and such maintenance requires a substantial portion of his time and attention, he must be said to be engaged in the business of maintaining a structure within the contemplation of the Workmen's Compensation [A]ct." *Walsh*, 345 Ill. at 370, 178 N.E. at 84.

Accord *Iowa-Illinois Gas & Electric Co.*, 407 Ill. at 366-67, 95 N.E.2d at 486.

Under these principles, the supreme court has repeatedly held employers whose principal business is to maintain structures as rental properties accountable under the Act pursuant to section 3. See *Walsh*, 345 Ill. at 370, 178 N.E. at 84 (concluding that employer who rented and maintained 10 buildings was liable under the Act when a worker was injured while repairing a roof of one of the properties); *Rogalski v. Industrial Comm'n*, 342 Ill. 37, 39-40, 173 N.E. 813, 814 (1930) (concluding that employer who owned, rented, and maintained property as well as a hotel was liable under the Act where claimant was injured while assisting in remodeling one of employer's buildings); *Jacobi v. Industrial Comm'n*, 342 Ill. 210, 213-14, 173 N.E. 748, 749 (1930) (owner of a three-unit apartment building who lived in one unit, but rented the remaining, was liable under the Act where a painter fell from a ladder and suffered a fractured skull); *Davis v. Industrial Comm'n*, 297 Ill. 29, 30-32, 130 N.E. 333, 334 (1921) (owner of apartment buildings liable under the Act where claimant was injured while washing one of the owner's buildings); *Storrs v. Industrial Comm'n*, 285 Ill. 595, 597, 121 N.E. 267, 267-68 (1918) (owner of rental properties liable under the Act where claimant was painting and calcimining one of the buildings and received a blinding injury to one of his eyes); *Johnson v. Choate*, 284 Ill. 214, 220, 119 N.E. 972, 974 (1918) (concluding that the defendant, who maintained and leased a large building, was liable under the Act to a worker injured while making plumbing repairs). Conversely, the court had held that employers who are performing maintenance work to their structures that is incidental to conducting their principal businesses are not subject to the Act pursuant to section 3. *Iowa-Illinois Gas & Electric Co.*, 407 Ill. at 367, 95 N.E.2d at 486 (although electric and gas company leased some space in its headquarters to another tenant

in the same building, the company was not liable under the Act for injuries to a window washer because rental of space was "so trifling" as not to constitute a business of the company); *T. Johnson Co. v. Industrial Comm'n*, 306 Ill. 197, 201, 137 N.E. 789, 791 (1922) (a cooperage company that entered into contract for the painting of its smokestacks at its factory was not in business of maintaining a structure because its "buildings were only a necessary incident or means as a place of carrying on the business"); see also 1 T. Angerstein, Illinois Workmen's Compensation § 810, at 462 (1952) ("The maintaining of buildings occupied and used incident to the conducting a business or enterprise [is] not within the provisions of subsection 1 of section 3").

In 1969, the supreme court reapplied the above principles and rules in *Pulliam*, 43 Ill. 2d 364, 253 N.E.2d 448. In that case, Pulliam operated a funeral home business and employed claimant to drive ambulances and to help with funerals. When this work was slow, however, Pulliam also assigned claimant to paint the funeral home. The court decided that "a funeral home comes within that line of cases holding that the rental of a structure by the owner for profit constitutes maintaining a structure." *Pulliam*, 43 Ill. 2d at 365-66, 253 N.E.2d at 459. The court reasoned:

> "The principal purpose of the funeral home is to provide a place for the family and friends of the decedent to view him and possibly conduct a funeral service there. The funeral service and viewing can [be], and sometimes [are], done in some other building. Nevertheless, the viewing and possibly the funeral service [are] normally conducted at a funeral home which is designed for this activity. While the cost of the use of the room or rooms and appurtenant facilities at the funeral home by the decedent, his family[,] and friends is not normally made as a separate charge, there is no doubt that such use constitutes a part of the charge by the funeral director. In short, the use of the funeral home for the activity conducted therein is not unlike the use of a hotel or motel room for lodging or a hall for a wedding reception or other ceremony." *Pulliam*, 43 Ill. 2d at 366, 253 N.E.2d at 449.

While the reasoning in *Pulliam* that the funeral home business is akin to a business of owning and managing rental properties is tenuous, it is nevertheless in accord with the aforementioned supreme court precedent. However, the court in *Fefferman* clearly misstates the holding in *Pulliam*. In *Fefferman*, the employer was in the business of supplying merchandise, textiles, government surplus, and hospital supplies. The employer stored these goods at a building that was held in trust for him and his family. In finding that employer was in the

business of maintaining a structure, the court purportedly followed *Pulliam*. It stated in part:

> "Although *Pulliam* analogized the use of a funeral home to the renting of a hotel or motel room for a wedding reception or other ceremony, its clear rationale was that the building was a capital asset which had a noticeable or conspicuous impact on the generation of revenue from his business to the owner of the building. *Pulliam* effectively, albeit *sub silentio*, overruled the *Walsh* line of cases insofar as they held that maintaining a building as an incident to a business is not maintaining a structure under the Act." (Emphasis omitted.) *Fefferman*, 71 Ill. 2d at 330, 375 N.E.2d at 1279.

The court concluded that the trust property was a prominent aspect of employer's revenue he received from his business. It reasoned that the property was a capital asset because he stored his goods there and that, consequently, there was no doubt that it contributed to the revenue, even if only indirectly. *Fefferman*, 71 Ill. 2d at 330, 375 N.E.2d at 1279; see also *Graphic Group*, 167 Ill. App. 3d at 1045, 522 N.E.2d at 131 (following *Fefferman*).

As is readily apparent, the supreme court misstated the *Pulliam* decision and clearly disregarded its holding. In so doing, it rejected a long line of cases that applied a commonsense interpretation of section 3. Even worse, it ignored the plain and unambiguous language of that section. *Pulliam* did not in any way overrule the *Walsh* line of cases. Rather, it was the *Fefferman* court that changed the law. However, instead of being intellectually honest and saying so, it claimed the *Pulliam* court had changed the law.

I respectfully submit that the proper interpretation of section 3 is the one followed in *Walsh* and its progeny. Unfortunately, the *Fefferman* court has left us with no choice but to disrespect the clear intent of the Act.