901 A.2d 956 (2006)
386 N.J. Super. 423
Dennis CUNNINGHAM, Petitioner-Respondent,
v.
ATLANTIC STATES CAST IRON PIPE CO., Respondent-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 28, 2006.
Decided June 26, 2006.
Wendy Johnson Lario, Florham Park, argued the cause for appellant (Pitney Hardin, attorneys; Ms. Lario and Frank A. Romano, on the brief).
Brian A. Roemersma, Phillipsburg, argued the cause for respondent (Winegar, Wilhelm, Glynn & Roemersma, attorneys; Mr. Roemersma, on the brief).
Before Judges COBURN, COLLESTER and LISA.
The opinion of the court is delivered by
LISA, J.A.D.
This is a workers' compensation case. The petitioner, Dennis Cunningham, suffered a compensable injury, returned to full duty work, and was later terminated *957 for cause. Before he obtained other employment, his injury disabled him from the ability to work. The judge of compensation determined that temporary disability benefits were available because, notwithstanding his termination, Cunningham was incapacitated and had not taken himself out of the labor market. We agree that an employee is not precluded from receiving temporary disability benefits under these circumstances. However, because temporary disability benefits constitute replacement for actual wage loss, the employee must prove that but for the disability he would have been employed. The record is lacking in this regard. Therefore, we reverse and remand for further proceedings.
Cunningham worked as a machine operator for respondent, Atlantic States Cast Iron Pipe Co. (Atlantic States), since 2001. On October 21, 2003, he was injured at work. He suffered a torn medial meniscus to his left knee. Atlantic States' designated physician, Dr. Karl Helmold, treated Cunningham and performed an arthroscopic surgical repair on December 9, 2003.
An Atlantic States policy provided that an employee would be terminated who inexcusably failed to report to work for three consecutive days. In November 2003, Cunningham failed to report for three consecutive days due to incarceration. He was terminated pursuant to the company policy, but through the efforts of his union, he was reinstated under a "last chance" agreement. The agreement provided that he could keep his job if he had no unauthorized absences for one year. He returned to work under the agreement on January 5, 2004.
Initially, Cunningham was assigned light duty, but Helmold cleared him for full duty as of January 23, 2004. Working without restrictions, he successfully completed his last chance agreement on January 5, 2005. In mid-January 2005, because of an outstanding traffic warrant, Cunningham was again incarcerated. He called his employer from jail and was informed he would be terminated if he did not return to work within three days. He arrived at work on the third day between 11:00 a.m. and noon, but his scheduled shift was 7:00 a.m. to 3:00 p.m. Atlantic States deemed this a violation of the three-day policy and terminated him. He refused to leave, and the employer called the police to remove him.
The union negotiated another last chance agreement similar to the previous one, and Cunningham was scheduled to return to work on February 2, 2005. Because he had to make childcare arrangements, he requested and was given a one-day extension. He reported at 7:00 a.m. on February 3, 2005, but in less than an hour received a call, which he said was from the childcare provider advising that new arrangements needed to be made immediately. He said he had not paid the provider and there was a misunderstanding about payment arrangements. Cunningham testified that he asked Atlantic States' human resources manager, James Surca, for permission to leave temporarily so he could attempt to place the children in the care of a relative or friend. He said Surca told him if he left he would be terminated. He left work and was terminated. He made no further efforts to be reinstated.
Surca gave a different version of the discussion with Cunningham. He said Cunningham came into his office, informed him he could not live up to his agreement because of the childcare problem, said he was leaving, and left. Surca denied telling Cunningham he would be terminated if he left. The judge of compensation accepted Cunningham's version, a finding supported by the record and to which we defer. Close v. Kordulak Bros., 44 N.J. 589, 599, *958 210 A.2d 753 (1965). For reasons we will discuss, the outcome would be the same under either scenario.
On February 11, 2005, just eight days after his termination, Cunningham went on his own accord to Helmold, who examined him and issued a note stating that he was unable to work because of his knee injury. Helmold estimated that Cunningham would not be able to return to work until August 1, 2005. On May 5, 2005, Cunningham filed a motion for temporary disability and medical benefits. Atlantic States did not contest the request for medical benefits, nor does it dispute that Cunningham is entitled to a permanent disability award, for which a claim is pending. Atlantic States' opposition to the claim for temporary disability was not medically grounded. Atlantic States did not dispute the opinion of its designated physician that Cunningham was unable to work because of the injury. Instead, Atlantic States argued that Cunningham suffered no wage loss because he had been performing full duty work and required no medical treatment for about a year, he voluntarily abandoned his employment, and he was unemployed.
The judge of compensation reasoned that Cunningham did not intend to remove himself from the labor market and, to the contrary, "he was extremely distressed at losing his employment and very much wanted to retain his job." She concluded:
Our statute requires respondents to pay temporary disability so long as petitioners are incapacitated due to work-related injury and have not reached maximum benefit of treatment. This obligation continues after they leave the employment irrespective of whether they left voluntarily. . . . I am aware of no authority requiring a petitioner to continue in a position to remain eligible for temporary disability benefits and no one has called any to my attention.
She therefore entered an order on July 21, 2005, directing Atlantic States to pay Cunningham temporary disability benefits "beginning as of February 11, 2005 and until such time as petitioner reaches maximum medical improvement or returns to work, whichever occurs first."[1] This appeal followed.
Temporary disability benefits are payable during the period of disability, not to exceed 400 weeks, N.J.S.A. 34:15-12a, from the day the employee is first unable to work because of the injury until the employee "is able to resume work and continue permanently thereat," N.J.S.A. 34:15-38. "Generally, temporary disability continues `until the employee is able to resume work and continue permanently thereat' or until he [or she] `is as far restored as the permanent character of the injuries will permit,' whichever happens first." Monaco v. Albert Maund, Inc., 17 N.J.Super. 425, 431, 86 A.2d 279 (App. Div.1952). Actual absence from work is a prerequisite to a temporary disability award. Calabria v. Liberty Mut. Ins. Co., 4 N.J. 64, 68, 71 A.2d 550 (1950). An injured worker who resumes work after a period of disability who later experiences a relapse may later recover for intermittent or recurrent intervals of temporary disability. Colbert v. Consol. Laundry, 31 N.J.Super. 588, 596, 107 A.2d 521 (App. Div.1954).
The purpose of temporary disability benefits is to provide an individual who *959 suffers a work-related injury with a "partial substitute for loss of current wages." Ort v. Taylor-Wharton Co., 47 N.J. 198, 208, 219 A.2d 866 (1966). Application of this well-settled principle is at the heart of the dispute in this case. Atlantic States does not dispute that as of February 11, 2005, Cunningham was unable to work because of his work-related injury. Had Cunningham continued to be in its employ on that date (or, conversely, had he gone to Helmold two weeks earlier with the same result), a current wage loss would have resulted and a recurrent disability period would have plainly begun, during which temporary benefits would have been payable. But, because Cunningham was not employed when the new disability period began, Atlantic States argues there was no current wage loss and no entitlement to temporary disability benefits.
This brings us to the circumstances of Cunningham's separation from employment. In Electronic Associates, Inc. v. Heisinger, 111 N.J.Super. 15, 20, 266 A.2d 601 (App.Div.), certif. denied, 57 N.J. 139, 270 A.2d 42 (1970), we held that an employee who retired from employment because of her pregnancy was not entitled to a temporary disability award for an injury that occurred during her employment but did not manifest itself until after her retirement because "she suffered no current wage loss as a result of an ailment attributable to her occupation. Rather, her loss of wages was the direct result of the voluntary termination of her employment." The reason for her separation was totally unrelated to her employment. Ibid.
Atlantic States argues that Cunningham knowingly and voluntarily violated a condition of his employment, of which he was on notice, and therefore it was his own affirmative act that caused his separation. Thus, like the employee in Heisinger, Atlantic States argues that Cunningham is barred from recovery of temporary disability because, knowing that the consequences of leaving work on February 3, 2005, without authorization would be his termination, he, in effect, voluntarily chose to end the employment relationship. In further support of its argument, Atlantic States directs us to the rule laid down by the courts in Ohio. See State ex rel. La.-Pac. Corp. v. Indus. Comm'n of Ohio, 72 Ohio St.3d 401, 650 N.E.2d 469 (1995) (employee who violated three-day absence rule, which the company handbook defined as a dischargeable offense, voluntarily left employment and was barred from receiving temporary disability benefits).
Cunningham argues that his separation from employment was not voluntary. He contends that he was fired and, as the judge of compensation found, he did not want to lose his job. For the purposes of our analysis, the distinction drawn by the parties places form over substance. We see no material difference between termination for cause, with prior knowledge by the employee that violation of a work rule would result in termination, and voluntary departure. There has been no allegation that Atlantic States fired Cunningham because of disability or to avoid payment of temporary disability benefits. See N.J.S.A. 34:15-39.1 (making it unlawful for an employer to discriminate against an employee because the employee has claimed or attempted to claim compensation benefits, and which authorizes sanctions against the employer). Under the circumstances that existed on February 3, 2005, Atlantic States had no reason to anticipate a temporary disability claim. The purpose of temporary disability benefits is to provide an employee with partial wage loss replacement during a period of disability caused by a work-related injury. The reason for separation from employment, if unrelated to the employment or disability, is not dispositive of the overriding *960 issue  did the employee suffer a current wage loss?
As we have stated, a current wage loss need not be continuous from the initial onset of the disability period, Colbert, supra, 31 N.J.Super. at 596, 107 A.2d 521, nor must it derive from wages lost from the job on which the injury occurred, Outland v. Monmouth-Ocean Educ. Serv. Comm'n, 154 N.J. 531, 540, 713 A.2d 460 (1998). Had Cunningham commenced other employment prior to February 11, 2005, and then had to stop working because of this injury, he would have experienced a current wage loss, and we see no reason why he would not have been entitled to receive temporary disability benefits until he was able to return to work or reached maximum medical improvement.
The courts of other states have reached different results as to whether an employee who causes his own unemployment after resuming employment following a work-related injury should be permitted to receive temporary disability benefits. An employee may cause his or her own unemployment by either misbehaving, causing the employer to terminate or demote the employee, or the employee may quit his or her job voluntarily. Arthur Larson, Larson's Workers' Compensation Law § 84.04 (2005).
Some courts subscribe to the rule that an employee who causes his or her own unemployment forfeits the right to seek temporary disability benefits if after being terminated or quitting a doctor orders the employee to temporarily cease working because of the work-related injury. See, e.g., State ex rel. La.-Pac. Corp. v. Indus. Comm'n, supra, 72 Ohio St.3d 401, 650 N.E.2d 469 (holding that termination caused by misconduct reaps the same repercussions as voluntarily quitting such that the employee will be denied temporary disability benefits); Ucci v. Hathaway Bakeries, Inc., 75 R.I. 341, 66 A.2d 433 (1949) (holding an employee could not receive temporary disability benefits where he had returned to his prior supervisory position after injury, but was later demoted for misconduct to a position where he was unable to perform the duties required because of his prior injury); Richfood, Inc. v. Williams, 20 Va.App. 404, 457 S.E.2d 417 (1995) (holding a termination of benefits was proper where after injury and before being permitted to return to light duty work, the employee failed a required drug test). The rationale applied by these courts is that the employee's unemployment was not due to the injury but to his or her own actions.
Other courts have held that when an employee voluntarily quits or is terminated because of misconduct, it is possible to obtain temporary disability benefits. See, e.g., Betancourt v. Sears Roebuck & Co., 693 So.2d 680 (Fla.Dist.Ct.App.1997) (holding an employee can obtain temporary disability benefits for a work-related injury who can demonstrate that his or her condition after being terminated precluded the employee from earning the same wage as before being terminated); Diamond Rug & Carpet Mills v. Moses, 221 Ga.App. 807, 472 S.E.2d 565, 567 (1996) (holding an employee may obtain temporary disability benefits for a work-related injury who can establish by a preponderance of the evidence that "he or she suffered a loss of earning power as a result of a compensable work-related injury; continues to suffer physical limitations attributable to that injury; and has made a diligent, but unsuccessful effort to secure suitable employment following termination"); In re Peng Kim v. Cmty. Living Corp. 253 A.D.2d 911, 677 N.Y.S.2d 818, 819 (App.Div.1998) (commenting that obtaining benefits remains possible where an employee is terminated for misconduct if the employee *961 demonstrates "by substantial evidence that the limitations on his employment due to his disability were a cause of his subsequent inability to obtain employment"), appeal denied, 93 N.Y.2d 802, 687 N.Y.S.2d 626, 710 N.E.2d 273 (1999). The rationale employed by these courts focuses on the casual connection between wage loss and the injury, reasoning that if the employee can prove that his or her unemployed status was proximately caused by the injury, workers' compensation temporary disability benefits should be awarded.
Dean Larson notes the conundrum where an employee is unemployed by his own actions, but is unable to obtain employment elsewhere because of his or her temporary disability caused by work-related injury. Larson, supra, § 84.04. He suggests that instead of denying the employees all compensation rights, perhaps legislatures should construct a system similar to unemployment compensation legislation, by setting a penalty of a limited number of weeks during which compensation benefits would be unavailable. Ibid. Of course, our Workers' Compensation Act contains no such provision. We interpret the provisions the Act does contain, mindful of its remedial and beneficent purposes. In doing so, we adopt the more flexible approach that allows temporary disability benefits in these circumstances upon a proper showing of causation.
We find unpersuasive Atlantic States' reliance on Heisinger. There, the employee retired, removing herself from the workforce. Heisinger, supra, 111 N.J.Super. at 21, 266 A.2d 601. Thus, for her, a temporary disability award would have been impermissibly based on "a fictitious wage-earning status" during the period of her disability. Ibid.; see also Tamecki v. Johns-Manville Prod. Corp., 125 N.J.Super. 355, 359, 311 A.2d 20 (App.Div.1973) (finding that a full-time college student injured during a summer job was precluded from receiving temporary disability benefits after he resumed school in September, noting that he was "able but unavailable to work because of his college program") certif. denied, 64 N.J. 495, 317 A.2d 707 (1974).
Cunningham did not remove himself from the workforce by the events of February 3, 2005. The judge of compensation's finding in that regard is amply supported by the record. Close v. Kordulak Bros., supra, 44 N.J. at 599, 210 A.2d 753. That circumstance, however, is not sufficient to entitle Cunningham to temporary disability benefits. The claimant has the burden of proving not only that he was available and willing to work, but that he would have been working if not for the disability. We know, for example, that for the first day Cunningham was awarded temporary disability, February 11, 2005, he was not employed. Thus, the benefit for that day was replacement for nothing more than a theoretical or fictitious wage loss. There is nothing in the record to suggest that he had any promise or prospect of employment to begin in the days following February 11, 2005 that he had to forgo because of the disability. Thus the supposed wage loss replacement for those days was not for actual lost wages.
In Outland, the Court considered the plight of a teacher injured during her ten-month school contract, whose disability continued into the summer recess. The Court distinguished between those teachers who planned to work during the summer and were prevented from doing so because of a work-related injury, and those who planned to take the summer off. Outland, supra, 154 N.J. at 542, 713 A.2d 460. Payment of temporary disability benefits to the former would provide replacement for income actually lost, but for the latter would constitute an improper windfall. Id. *962 at 542-43, 713 A.2d 460. That the lost income was from a job different than the teaching job on which the injury occurred was no impediment to the claim. Id. at 540, 713 A.2d 460. The Workers' Compensation Act is not "tied to a particular occupation" and "[t]he injured teacher should be entitled to workers' compensation temporary disability benefits during the summer if she can prove that she is unable to resume whatever type of work she otherwise would have had." Id. at 538-39, 713 A.2d 460. The Court remanded to the Division of Workers' Compensation to afford the teacher an opportunity to prove that she would have worked and therefore actually lost income during the summer. Id. at 543, 713 A.2d 460.
These principles guide our determination here. If Cunningham can prove that he actually lost income on or after February 11, 2005, because of his disability, he is entitled to receive temporary disability benefits to that extent. To allow any more or any less would contravene N.J.S.A. 34:15-38 (temporary disability payable during time employee is "unable to continue at work by reason of the accident" (emphasis added)), and the Outland holding. In our view, on the record before us, the judge of compensation's order bestowed upon Cunningham a windfall. Because of the novelty of the issue, we follow the Court's approach in Outland and remand to the Division of Workers' Compensation to afford Cunningham an opportunity to prove actual wage loss.
We recognize that in a factual complex such as this the proofs will likely be more difficult than in the case of teachers. Because a teacher's situation involves a recurring cycle, he or she might well be able to demonstrate a pattern of summer employment over a number of years or an actual promise of employment for the upcoming summer. A teacher knows in advance of his or her availability for summer work and would be expected to plan to arrange it. Cunningham's separation from employment, on the other hand, was not planned in advance.
Nevertheless, until his last day of work with Atlantic States, Cunningham was working full duty, as he had been for about a year, and without the need for medical treatment. We do not know whether he made any efforts to seek employment before his visit with Helmold. Once advised by Helmold that he could not work for about six months, he might not reasonably be expected to have sought employment. But he left his job (whether characterized as voluntarily or as a termination for cause in violation of a company policy he knew would result in termination), and, without new employment secured, he did so at his peril. His leaving was not related in any way to his disability.
Perhaps the testimony of an occupational expert, considering the totality of the circumstances, including Cunningham's background, skills, education, prior work history, and the like, as well as the area job market, could provide evidence as to how long it would have likely taken for him to secure employment had he not been disabled. We do not suggest that expert testimony is a necessary element of proof. The potential difficulties in proofs and the elusiveness of a precise result do not dissuade us from requiring that this construct be followed. It will assure that our State's workers' compensation scheme is faithfully implemented and is fair to both employer and employee.
Reversed and remanded for further proceedings.
NOTES
[1] The order also required payment of medical benefits, which have never been disputed. On September 22, 2005, the judge of compensation denied Atlantic States' motion for a stay pending appeal, but ordered that temporary disability benefits paid to petitioner shall be deducted from any permanency award should the Appellate Division reverse or modify the order under review.