INTERSTATE SCAFFOLDING, INC., Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION et al. (Jeff Urban, Appellee).

Third District (Illinois Workers' Compensation Commission Division)
No. 3—07—0801WC

Opinion filed October 20, 2008.—Rehearing denied December 1, 2008.

Anthony J. Cacchillo, of William J. Cook & Associates, of Chicago, for appellant.

Patrick Serowka and Mitchell W. Horwitz, both of Horwitz, Horwitz & Associates, Ltd., of Chicago, for appellee.

JUSTICE GROMETER delivered the opinion of the court:

Claimant, Jeff Urban, sustained a work-related injury while in the employ of respondent, Interstate Scaffolding, Inc. Claimant was eventually cleared to return to light-duty work. Respondent accommodated the restrictions, but subsequently terminated claimant for defacing company property. At issue in this case is whether claimant is entitled to the payment of temporary total disability (TTD) benefits following his termination. The arbitrator ruled that claimant was not so entitled, but the Workers' Compensation Commission (Commission) and the circuit court of Will County disagreed. We hold that an employee is not entitled to collect TTD benefits after he voluntarily removes himself from the work force for reasons unrelated to his injury.

## I. BACKGROUND

Claimant was employed by respondent as a union carpenter. On July 2, 2003, he suffered a work-related injury to his head and neck and sought medical treatment from Dr. James Young. Dr. Young eventually authorized claimant to return to work subject to certain lifting restrictions, and in February 2005, claimant began working light duty for respondent at one of its facilities in East Hazel Crest, Illinois. At the arbitration hearing on his application for adjustment of claim, claimant testified that the work provided by respondent was within the restrictions prescribed by Dr. Young. Claimant continued to work light duty on a regular basis until May 25, 2005, when his employment was terminated.

With respect to the events leading to his discharge, claimant testified that sometime in April 2005, he had written religious inscriptions on the walls and shelves in a storage room on respondent's premises. Claimant stated that he wrote the inscriptions with permanent marker

and that some of his coworkers were aware of the writings. Claimant also indicated that there was other graffiti and drawings on the storage-room shelves prior to when he made the inscriptions. Nevertheless, claimant acknowledged that he did not have permission from respondent to write on the walls and shelves. He also stated that the writings did not pertain in any way to his job duties with respondent and that, aside from the storage room, at no other location on respondent's premises did non-work-related slogans or writings appear on the walls, affixed shelves, or elsewhere.

On May 25, 2005, claimant brought his paycheck to Rebecca Parks, an employee in respondent's payroll department. Claimant contacted Parks because he had been overpaid and because no federal taxes were being withheld from his paycheck. Claimant testified that he had received other paychecks that contained overpayments and he "didn't want to get accused for not saying anything." After claimant spoke to Parks, she contacted Jan Coffey, the assistant to Ronald Fowler, respondent's president. According to claimant, Coffey approached him, called him a "hypocrite," and stated that if he believed the religious slogans that he had written on respondent's premises, he would have brought the erroneous paychecks to respondent's attention weeks earlier. Coffey testified that claimant responded that he "deserved those wages" and that he was a "union worker." In response to the confrontation with Coffey, claimant contacted the East Hazel Crest police department, complaining that he was being harassed and discriminated against because of his religious beliefs. A police officer came to respondent's facility, interviewed various individuals, and wrote a report. However, no arrests were made, and no one was charged with any crime. Coffey later contacted Fowler, who was out of town, to report the incident and the fact that claimant had contacted the police. At that time, Coffey informed Fowler for the first time about the writings claimant had made on the walls and shelves in the storage room. Fowler subsequently instructed Barry Manuel, claimant's supervisor, to terminate claimant for defacing company property.

The arbitrator declined to award claimant TTD benefits subsequent to his dismissal. The arbitrator wrote that, "[n]otwithstanding the divisive, conflicting testimony regarding the arguments and confrontations of May 25, 2005 at the Respondent's place of business and the unusual basis for the termination of [claimant], this arbitrator finds [claimant] is not entitled to temporary total disability benefits subsequent to his termination of May 25, 2005." The Commission modified the decision of the arbitrator and remanded the cause pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980). Relevant here, the Commission found that claimant was entitled to TTD

benefits from May 25, 2005, through the date of the arbitration hearing, "based on the fact that [claimant's] condition had not stabilize [*sic*]" as of the date of the arbitration hearing. The circuit court of Will County confirmed the Commission's decision. Respondent then filed the instant appeal.

## II. ANALYSIS

■ The principal issue in this appeal is whether the Commission erred in awarding claimant TTD benefits following his termination from respondent's employ on May 25, 2005. The principles governing TTD benefits are well settled. A claimant is temporarily totally disabled from the time an injury incapacitates him from work until such time as he is as far recovered or restored as the permanent character of his injury will permit. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 542 (2007). A claimant seeking TTD benefits must prove not only that he did not work, but that he was unable to work. *F&B Manufacturing Co. v. Industrial Comm'n*, 325 Ill. App. 3d 527, 531 (2001). The dispositive inquiry is whether the claimant's condition has stabilized, *i.e.*, whether the claimant has reached maximum medical improvement (MMI). *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 594 (2005). The factors to consider in assessing whether a claimant has reached MMI include a release to return to work, medical testimony or evidence concerning the claimant's injury, and the extent of the injury. *Freeman United Coal Mining Co. v. Industrial Comm'n*, 318 Ill. App. 3d 170, 178 (2000). Once an injured claimant has reached MMI, the disabling condition has become permanent and he is no longer eligible for TTD benefits. *Nascote Industries v. Industrial Comm'n*, 353 Ill. App. 3d 1067, 1072 (2004). The period during which a claimant is temporarily totally disabled is a question of fact for the Commission, and its determination will not be disturbed on review unless contrary to the manifest weight of the evidence. *Cropmate Co. v. Industrial Comm'n*, 313 Ill. App. 3d 290, 296 (2000). In determining whether a factual finding of the Commission is against the manifest weight of the evidence, the relevant test is whether the record contains sufficient factual evidence to support the Commission's determination. *F&B Manufacturing Co.*, 325 Ill. App. 3d at 532.

In this case, we cannot say that the Commission's finding that claimant was temporarily totally disabled at the time of his termination was against the manifest weight of the evidence. A review of the record demonstrates that, as of the date of the arbitration hearing, claimant had not been released to full-duty work. Further, none of claimant's treating physicians indicated that claimant had reached

MMI. In fact, the medical evidence establishes that claimant continues to experience various symptoms connected with the work-related accident for which he was still being treated. Thus, there was sufficient evidence to support the Commission's finding that claimant's condition had not stabilized.

Although we agree that claimant was still temporarily totally disabled at the time of his termination, the more interesting aspect of this appeal is whether claimant is entitled to TTD benefits following his discharge from respondent's employ. In confirming the decision of the Commission, the circuit court stated that "[t]he Commission determined that the [claimant] was not fired for cause." We find no language to this effect in the Commission's decision. To the contrary, as respondent conceded during oral arguments, the arbitrator relied on claimant's discharge in deciding that claimant was not entitled to TTD benefits after May 25, 2005. Thus, the arbitrator tacitly concluded that claimant's termination was for cause. The Commission affirmed that portion of the arbitrator's decision. Nevertheless, the parties have not provided us with any authority addressing the impact of an employee's termination on his entitlement to TTD benefits subsequent to the date of dismissal. Respondent, however, equates the circumstances of this case to situations in which an employee has refused work falling within the physical limitations prescribed by his doctor or in which the employee fails to cooperate in good faith with rehabilitation efforts. In general, these lines of cases provide that an employee is not entitled to TTD benefits. See, *e.g.*, *Stone v. Industrial Comm'n*, 286 Ill. App. 3d 174, 179-80 (1997) (failure to cooperate); *Hayden v. Industrial Comm'n*, 214 Ill. App. 3d 749, 755-56 (1991) (same); *Gallentine v. Industrial Comm'n*, 201 Ill. App. 3d 880, 887 (1990) (refusal of light-duty work); *Presson v. Industrial Comm'n*, 200 Ill. App. 3d 876, 880-81 (1990) (same); *Boker v. Industrial Comm'n*, 141 Ill. App. 3d 51, 54-55 (1986) (same); but see *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 116-17 (1990) (rejecting the employer's claim that because the employee was dilatory with his rehabilitation efforts, he was not entitled to TTD benefits where the employee's rehabilitation counselor testified that the employee's progress was satisfactory and where the time frame requested by the employer would have required the employee to engage in more hours of rehabilitation than authorized by his physician); *Jewel Food Cos. v. Industrial Comm'n*, 256 Ill. App. 3d 525, 531-32 (1993) (rejecting the employer's claim that the employee failed to cooperate with vocational rehabilitation where the employee contacted 25 employers on his own, he contacted some of the leads provided by his vocational counselor, he advised counselor that he

could not meet his financial obligations if he accepted a low-paying job, and he made a "concerted effort" to return to work for the employer).

Although the cases cited by respondent provide some guidance, they are not directly on point. More analogous are two decisions addressing the impact on TTD benefits where the employee returns to light-duty work but is subsequently taken out of the work force. In *City of Granite City v. Industrial Comm'n*, 279 Ill. App. 3d 1087 (1996), the claimant suffered a knee injury while working as a police officer. Following surgery, the claimant returned to a light-duty position. He worked intermittently for several months, until he took disability retirement. The claimant also sought TTD benefits following his retirement. The Commission denied the request, holding that the claimant voluntarily left his light-duty job and removed himself from the workforce in order to collect a pension. We affirmed the Commission's decision, noting that the claimant did not present any evidence demonstrating that his injury had not stabilized, that he had not been released for light-duty work, or that he could not perform light-duty work. *Granite City*, 279 Ill. App. 3d at 1090-91.

In contrast to *Granite City* is *Schmidgall v. Industrial Comm'n*, 268 Ill. App. 3d 845 (1994). In *Schmidgall*, the claimant injured the right side of his body when a coworker accidentally tripped him. Following the injury, the claimant worked in a light-duty capacity until his doctor took him off work. At that time, the respondent began paying TTD benefits. A few months later, the claimant also began receiving social security benefits. The Commission held that the claimant was precluded from receiving TTD benefits once he began receiving social security because the claimant "had removed himself from the work force." *Schmidgall*, 268 Ill. App. 3d at 848. We disagreed, reasoning that the claimant had not voluntarily removed himself from the workforce. *Schmidgall*, 268 Ill. App. 3d at 849. Rather, his doctor had by not releasing him to return to work. *Schmidgall*, 268 Ill. App. 3d at 849. Thus, *Granite City* and *Schmidgall* suggest that the critical inquiry in determining whether the employee is entitled to TTD benefits after leaving the workforce centers on whether the departure was voluntary.

In addition to *Granite City* and *Schmidgall*, we also find instructive to our analysis cases from other jurisdictions which address an employee's entitlement to TTD benefits following a discharge for misconduct. In his noted treatise, Professor Arthur Larson outlines the two approaches used in those jurisdictions that have addressed this issue. See 4 A. Larson & L. Larson, Worker's Compensation Law §84.04(1), at 84—17 (2007). Some jurisdictions deny compensation to

employees who, after resuming employment following a work-related injury, are terminated for misconduct where the disability played no part in the discharge. See, *e.g.*, *Palmer v. Alliance Compressors*, 917 So. 2d 510, 514 (La. App. 2005) (upholding denial of disability benefits following termination where the claimant was discharged for cause and the termination was unrelated to the claimant's injury); *Robinson v. Department of Employment Services*, 824 A.2d 962, 964-65 (D.C. App. 2003) (denying compensation where the claimant's termination was not connected to his injury); *Sibley v. Unifirst Bank for Savings*, 699 So. 2d 1214, 1220 (Miss. 1997) (rejecting argument that the claimant was entitled to disability benefits following termination for criminal activity where the claimant failed to show that her job-related injury played any part in her discharge); *Calvert v. General Motors Corp.*, 120 Mich. App. 635, 643, 327 N.W.2d 542, 546 (1982) (holding that an employee who is discharged for "just cause" is not entitled to workers' compensation benefits); *Goodyear Tire & Rubber Co. v. Watson*, 219 Va. 830, 833, 252 S.E.2d 310, 312-13 (1979) (finding that employee who is terminated for cause and for reasons not associated with his disability is not entitled to benefits). These courts reason that an employee should not be rewarded with disability benefits where the unemployment was not related to the disability but rather to a volitional act over which the employee exercised some control. See, *e.g.*, *Palmer*, 917 So. 2d at 513 ("[W]e recognize that an injured employee cannot *** blatantly violate company policy without the possibility of recourse by the employer"); *Calvert*, 120 Mich. App. at 643, 327 N.W.2d at 546 (defining termination for "just cause" to include only those "voluntary acts of the employee").

Courts in other jurisdictions hold that an employee's discharge from light-duty work for misconduct unrelated to his disability does not automatically bar the employee from receiving disability benefits. These courts allow the employee to collect benefits if he can establish that the work-related disability hampers the employee's ability to obtain or hold new employment. See, *e.g.*, *Cunningham v. Atlantic States Cast Iron Pipe Co.*, 384 N.J. Super. 423, 433, 901 A.2d 956, 962 (2006) (holding that an employee who is terminated for cause will be entitled to disability benefits after termination if he can show actual wages lost because of the injury); *Seagraves v. Austin Co.*, 123 N.C. App. 228, 232-33, 472 S.E.2d 397, 401 (1996) (concluding that where an employee who has sustained a compensable injury and has been provided light-duty employment is terminated for misconduct, the employee will be entitled to TTD benefits if the employee can show that any posttermination loss of wages is due to the work-related disability); *Marsolek v. George A. Hormel Co.*, 438 N.W.2d 922, 924 (Minn.

1989) ("[A] justifiable discharge for misconduct suspends an injured employee's right to wage loss benefits; but the suspension of entitlement to wage loss benefits will be lifted once it has become demonstrable that the employee's work-related disability is the cause of the employee's inability to find or hold new employment"). The focus in these cases is on the causal connection between the wages lost and the injury. The courts reason that if the employee can prove that the loss in wages was proximately caused by the injury, TTD benefits should be awarded. See, *e.g.*, *Cunningham*, 36 N.J. Super. at 432, 901 A.2d at 961 ("The claimant has the burden of proving not only that he was available and willing to work, but that he would have been working if not for the disability"); *Seagraves*, 123 N.C. App. at 234, 472 S.E.2d at 401 ("[T]he test is whether the employee's loss of *** wages *** is due to the employee's work-related disability, in which case the employee will be entitled to benefits for such disability"); *Marsolek*, 438 N.W.2d at 924.

The overriding purpose of the Illinois workers' compensation scheme is to compensate an employee for lost earnings *resulting from a work-related disability*. See *Freeman United Coal Mining Co. v. Industrial Comm'n*, 99 Ill. 2d 487, 496 (1984); *Beelman Trucking v. Illinois Workers' Compensation Comm'n*, 381 Ill. App. 3d 701, 708 (2008). Considering this purpose in conjunction with the case law discussed above, we find that allowing an employee to collect TTD benefits from his employer after he was removed from the work force as a result of volitional conduct unrelated to his injury would not advance the goal of compensating an employee for a work-related injury. Instead, it would provide a windfall by continuing to compensate the employee despite the fact that the cause of the lost earnings following the employee's departure is unrelated to the injury. We note that this approach comports with the one taken in *Granite City*, *Schmidgall*, and those jurisdictions that deny compensation to employees who are terminated for misconduct where the disability played no part in the discharge in that it focuses on the reason the employee was removed from the work force.

■ Turning to the facts in this case, we note that claimant did present evidence that his condition had not stabilized at the time that he was discharged. However, he had been released to light-duty work and, in fact, had been able to perform such work for respondent. Further, claimant admitted that he did not have permission from respondent to write on the walls and shelves in the storage room and that the writings did not pertain in any way to his job duties with respondent. In other words, claimant tacitly conceded that he was removed from the work force as a result of volitional acts unrelated to

his injury. Indeed, we find no evidence that would indicate that claimant was terminated so that respondent could avoid the payment of TTD benefits. Although some employees knew of claimant's actions weeks before his firing, the president of the company was not aware that claimant had defaced company property until shortly before the termination. Simply stated, but for his conduct in defacing respondent's property, claimant would have continued receiving TTD benefits until his condition had stabilized. Thus, we reverse the decision of the Commission awarding claimant to collect TTD benefits from respondent following his discharge for cause.

During oral arguments, we were advised that at the time that claimant was employed in the light-duty position, he was receiving a salary from respondent as well as a separate benefit from respondent's insurance carrier. Thus, we must also determine whether claimant is entitled to continue receiving this separate benefit from the insurance company following his termination. In resolving this issue, we find instructive *Nascote Industries*, 353 Ill. App. 3d 1067. In that case, the employee returned to part-time work for her employer following an injury. Following her return, the employer made voluntary benefit payments to the employee. The arbitrator classified these payments as maintenance and determined that the employer was not entitled to a credit for them against the permanency award. The Commission affirmed and adopted the arbitrator's decision. On appeal, we acknowledged that the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2004)) in effect for injuries prior to February 1, 2006, did not contemplate an award for "temporary partial disability."[1] *Nascote Industries*, 353 Ill. App. 3d at 1074. Yet we concluded that an injured worker who had not yet reached MMI and was working part-time within his or her restrictions might be entitled to maintenance benefits. *Nascote Industries*, 353 Ill. App. 3d at 1074-75.

As noted above, we were advised in this case that claimant was receiving benefits from respondent's insurance carrier, notwithstanding the fact that he was working in a light-duty capacity. An individual who is working is not entitled to TTD benefits. See *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d 828, 832 (2002) (stating that to establish entitlement to TTD benefits, an employee must show not only that he did not work, but that he was unable to work). Moreover, claimant's injury occurred on July 2, 2003, prior to the date upon which an injury must occur to be eligible for temporary partial dis-

---

[1]The Act now provides for an award of temporary partial disability benefits for accidental injuries occurring on or after February 1, 2006. See Pub. Act 94—0277, eff. July 20, 2005 (amending 820 ILCS 305/8(a)).

ability benefits. Thus, if, as we were informed, claimant was receiving benefits from respondent's insurance carrier, the benefits could only have been paid as maintenance. Maintenance is awarded incidental to vocational rehabilitation. 820 ILCS 305/8(a) (West 2004) ("The employer shall also pay for treatment, instruction and training necessary for the physical, mental and vocational rehabilitation of the employee, including maintenance costs and expenses incidental thereto"). In *Nascote Industries*, we concluded that part-time employment within the restrictions authorized by a claimant's doctor can be classified as a physician-approved rehabilitation plan. *Nascote Industries*, 353 Ill. App. 3d at 1075. As discussed earlier in this disposition, Illinois courts have held that the absence of good faith in cooperating with vocational rehabilitation efforts justifies the termination of TTD benefits. See, *e.g.*, *Hayden*, 214 Ill. App. 3d at 756. If the failure to cooperate with a rehabilitation plan provides a basis for disallowing future TTD benefits, it follows that being fired for cause from part-time employment also provides a basis for terminating any maintenance benefit that an employee might have been receiving incidental to that part-time employment. Accordingly, aside from our holding that claimant is not entitled to TTD benefits, we also find that claimant is no longer entitled to collect the portion of the maintenance benefit paid by respondent's insurance carrier.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court of Will County, which confirmed the decision of the Commission. We remand the matter to the Commission for further proceedings pursuant to *Thomas*, 78 Ill. 2d 327.

Reversed and remanded.

McCULLOUGH, P.J., and HOFFMAN, J., concur.

JUSTICE DONOVAN, dissenting:

I respectfully dissent. In this case, the majority has announced a new principle which provides that temporary disability benefits may be discontinued where an employee who, upon returning to light duty or to a rehabilitation assignment, is terminated from the work force as a result of his volitional acts of conduct (or misconduct) that are unrelated to his disabling condition. Though I accept the general principle, I cannot join in the remainder of the decision because the majority provides no standards for practical application of the newly announced principle. In addition, I disagree with the outright reversal

of the Commission's decision to award the claimant temporary disability and maintenance benefits.

According to the record, the claimant is a construction carpenter who was stricken with heat exhaustion on July 2, 2003, while working on a scaffold. Emergency responders were called to the work site to evaluate the claimant's condition. The medics determined that the claimant should be transported to the hospital for treatment. The medics placed the claimant on a backboard. As the medics began to move the claimant, they dropped him. His head and neck struck a toe board. The claimant felt pain in the back of his head and neck, and tingling in his arm immediately after the incident. The claimant was diagnosed with heat exhaustion, a mild concussion with postconcussion headaches and blurred vision, and a cervical strain with tingling in the right arm. An MRI revealed a small, broad-based disc bulge at C5-6. The claimant's physician noted complaints of severe sleep interruption and occasions of irritability and a short temper. The claimant's physician's differential diagnosis included possible cognitive problems.

The claimant began to work light duty in February 2005. His duties included cleaning the yard, organizing material, cleaning and organizing the storage facility, unloading trucks, and emptying scaffolding racks. The claimant was paid $20 an hour for the light-duty work, and he received a maintenance benefit from the respondent's workers' compensation carrier. He had been earning $32.15 an hour prior to the accident.

The claimant worked light duty until May 25, 2005, the date that the respondent terminated him for "defacing company property." The claimant acknowledged that he wrote religious maxims on the shelving in the storage area where he worked in April 2005. The claimant noted that he had seen other non-work-related writing and graffiti on the walls and on equipment at his work place. Photos admitted into evidence showed the writings for which claimant admitted responsibility and the other writings that the claimant referenced in his testimony. The claimant stated that his direct supervisor, two other supervisors, and Jan Coffey, the company president's administrative assistant, knew of his conduct several weeks before he was terminated. Prior to the date of termination, no one confronted the claimant about his actions and no one asked or ordered him to paint over his writings. The claimant was discharged only after he had a run-in with Jan Coffey over a wage overpayment.

Jan Coffey conceded that the claimant was not a problem employee. She noted that the company president was meticulous about his building, but she did not identify a company rule or policy that addressed the type of conduct committed by the claimant or the discipline

for such conduct. Coffey stated that she did not know what consequences her boss would impose.

It has been long held that the overriding purpose of the Illinois workers' compensation scheme is to compensate an employee for lost earnings resulting from work-related injuries. *Freeman United Coal Mining Co. v. Industrial Comm'n*, 99 Ill. 2d 487, 496, 459 N.E.2d 1368, 1373 (1984); *Lambert v. Industrial Comm'n*, 411 Ill. 593, 606, 104 N.E.2d 783, 789 (1952). Equally long-standing is the proposition that our workers' compensation laws should be interpreted and applied in a practical and commonsense manner to accomplish the ultimate purpose of the Act. *Lambert*, 411 Ill. at 599, 104 N.E.2d at 786.

Whether temporary disability benefits may be discontinued where an employee who, upon returning to light duty or to a rehabilitation assignment, is terminated from the work force is a question that has not been addressed in any reported decision in Illinois. The majority reviewed decisions from the courts of other jurisdictions and identified the two separate approaches to the issue. Compare *Palmer v. Alliance Compressors*, 917 So. 2d 510, 514 (La. App. 2005), with *Seagraves v. Austin Co.*, 123 N.C. App. 228, 472 S.E.2d 397 (1996). The majority concluded that the reasoned approach of jurisdictions that deny compensation to employees who, upon returning to modified duty or a rehabilitation assignment, are terminated for just cause unrelated to their disabling conditions comports with the purpose behind the Illinois workers' compensation scheme.

I accept this general principle, but I find the majority's decision to be incomplete because it lacks standards for a practical application of this new principle. After reviewing a number of authorities from other jurisdictions, I conclude that the framework set forth in the *Seagraves* decision provides a practical, commonsense approach that would serve the ultimate purpose of our compensation system. *Seagraves*, 123 N.C. App. at 233-34, 472 N.E.2d at 401. In my view, an employer, who terminates an injured employee and who discontinues the employee's temporary benefits, has the burden to establish (a) that the employee violated a rule or policy, (b) that the employee was fired for a violation of that rule or policy, (c) that the violation would ordinarily result in the termination of a nondisabled employee, and (d) that the violation was a voluntary act within the control of the employee and not caused by the employee's disability. If the employer establishes that its employee has engaged in misconduct constituting a constructive refusal to perform the work provided or to participate in the rehabilitation plan, then the burden shifts to the employee to produce evidence to rebut the employer's evidence or to establish that his work-related

injury contributed to his subsequent wage loss. If the employee establishes that the medical restrictions resulting from the work-related injury prevent him from securing employment at pre-injury work levels, temporary disability benefits should be payable for the loss of earning capacity.

Under this framework, it is not sufficient to show that there is just cause for the termination. The employer must show that there is just cause for the employer's refusal to pay temporary disability benefits. This type of approach serves to prevent an employer from using an infraction of company policy as a pretext for terminating an injured employee and cutting off his temporary disability benefits and to protect an employee against harassment leading to voluntary termination, and it also serves to insulate an employer against unacceptable behavior that ordinarily would result in the termination of an employee. See *Seagraves*, 123 N.C. App. at 234, 472 S.E.2d at 401; *Porter v. Ford Motor Co.*, 109 Mich. App. 728, 732, 311 N.W.2d 458, 460 (1981).

The majority has determined that the Commission's decision to award the claimant temporary disability benefits following his termination should be reversed outright. The majority concluded that the claimant "tacitly conceded that he was removed from the work force as a result of volitional acts unrelated to his injury" (385 Ill. App. 3d at 1047-48), based on his acknowledgments that he had written maxims with religious themes on shelves in the storage area where he worked and that his writings were unrelated to his job duties, and that the claimant would have continued receiving his temporary disability benefits until his condition stabilized had he not defaced the respondent's property. After a careful review of the record, I do not find adequate evidence to support this conclusion.

In this case, the nature of the claimant's termination was not addressed by the arbitrator or the Commission. There is no finding, express or implied, that the claimant was terminated for "just cause."[2] This may be because the parties presented little evidence on that issue. There is no evidence in the record to show that the claimant's conduct violated an established company rule, and there is no evidence

---

[2]It is important to note here that the Commission is charged with the responsibility to determine whether a covered employee suffered a work-related injury and, if so, the compensation to which he is entitled. Generally, it is not the role of the Commission to determine the reasons for an employee's discharge. Since issues of "just cause" termination and retaliatory discharge are not within the purview of the Commission, *res judicata* would not apply to the Commission's findings and determination that an employee's temporary benefits were properly discontinued following termination.

that the act of "defacing company property" triggered an immediate termination, rather than a suspension or a lesser discipline. The parties presented no evidence in regard to whether an able-bodied employee had ever been terminated for such conduct. There is no evidence in regard to whether the claimant would be able to find and hold other employment due to the work-related disabilities and the resulting medical restrictions. Finally, I note that the claimant reported trouble sleeping and an increase in irritability and temper since his injury, and that his treating physician was concerned about possible cognitive changes. Whether the claimant's conduct is related to his postconcussion symptoms is a factual question that has not been addressed by either party.

In light of the new principle announced in this disposition, I would reverse the decision of the Will County circuit court, vacate the decision of the Commission, and remand this case to the Commission with instructions to afford the parties an opportunity to present additional evidence in accordance with the framework set forth in this decision.

JUSTICE HOLDRIDGE joins in this dissent.

